FILED

FEB 27 2003

DAVID W. DANIEL, CLERK
US DISTRICT COURT EDNC
BY_____ DEP. CLERK

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

CIVIL ACTION NO. 5:02-CV-227-BR(3)

TONY JOHNSON,                )
              Plaintiff,     )
                             )    MEMORANDUM IN SUPPORT OF
vs.                          )    DEFENDANT'S MOTION TO DISMISS OR,
                             )    IN THE ALTERNATIVE, SUMMARY JUDGMENT
DRUCKER & FALK, LLC,         )    Rules 12 and 56, F.R.Civ.P.
              Defendant.     )
_____)

NOW COMES the defendant, Drucker & Falk, LLC ("D&F") and files this Memorandum In
Support of its Motion to Dismiss, or, in the Alternative, for Summary Judgment.  For the following
reasons, D&F's Motion should be GRANTED and Plaintiff's claims should be DISMISSED WITH
PREJUDICE.

### Summary of the Nature of the Case

In this action, Plaintiff alleges claims of (i) racial discrimination under Title VII, 42 U.S.C.
1981, 1988 and 2000e, *et seq.*, (ii) intentional infliction of emotional distress under state law, (iii)
negligent infliction of emotional distress under state law, and (iv) wrongful discharge under state law
contrary to public policy.  Plaintiff alleges that D&F failed to rehire him on the basis of race after
Plaintiff had voluntarily resigned from the company only a few months earlier.  (Complaint ¶¶ 12, 38;
Plaintiff's EEOC charge attached hereto as Exhibit 1).

On December 16, 1999, Plaintiff filed a charge of discrimination with the Equal Employment
Opportunity Commission ("EEOC") and was issued a dismissal and notice of rights on June 16, 2000.
(See Exhibit 2).  The EEOC was unable to conclude that the information obtained by it established a
violation of the statutes.  Plaintiff subsequently filed suit in the Superior Court of Wake County, North
Carolina on September 15, 2000.  Following initial discovery, Plaintiff dismissed its action without
prejudice on February 26, 2001.  On February 26, 2002, Plaintiff refiled his action *pro se* in the Wake
County Superior Court.  D&F then removed the action to the United States District Court for the



Eastern District of North Carolina on April 3, 2002. Charles J. Hutson, Esq. filed a Notice of Appearance on Plaintiff's behalf on June 6, 2002.

D&F respectfully contends that Plaintiff's claims should be dismissed for the following reasons as more fully explained below:

(i)  Plaintiff has failed to plead or demonstrate a *prima facie* case of race discrimination;

(ii)  Plaintiff cannot show D&F's justifications for refusing to consider rehiring Plaintiff were pretexts for discrimination, and

(iii)  Plaintiff has failed to sufficiently plead or produce any evidence to support his claims of negligent infliction of emotional distress, intentional infliction of emotional distress, or wrongful discharge under state law.

## Statement of Pertinent Facts

Plaintiff was hired in August, 1995 as a maintenance technician at Stonehenge Apartments in Raleigh, North Carolina, which is an apartment community managed by D&F. (Hayworth Aff. ¶ 4, Plaintiff Depo., p. 17). On July 15, 1997, Plaintiff was transferred to Laurens Way Apartments ("Laurens Way") where he was promoted to the position of Maintenance Superintendent. (Hayworth Aff. ¶ 4). Laurens Way, located in Knightdale, North Carolina, is another apartment community managed by D&F. Id.

Maintenance Superintendents at D&F-managed apartment communities are responsible for the maintenance, repair, and upkeep of their apartment community. (Hayworth Aff. ¶ 3, and Exhibit 1 thereto; Berry Aff. ¶ 3). One of the Maintenance Superintendent's primary duties is to continually inspect buildings, grounds and common areas to identify needed preventive maintenance and to insure that the buildings and common areas are clean. Id. Plaintiff acknowledged the foregoing in his deposition. (Plaintiff Depo., pp. 138-139).

Beginning in September 1998, Lawrence Berry became the Regional Property Manager for multiple apartment communities managed by D&F, including Laurens Way. (Berry Aff. ¶ 4). Regional Property Managers are responsible for the overall operations of their communities, including assisting in personnel hiring decisions for the communities. (Berry Aff. ¶ 2). Regional Maintenance

Coordinators coordinate and assist with maintenance issues and personnel at apartment communities located in their region. (Hayworth Aff. ¶ 2). Since May 1998, Steven Hayworth has been the Regional Maintenance Coordinator for D&F-managed apartment communities located in North Carolina. Id.

During numerous visits to Laurens Way between September and December 1998, Mr. Berry found (i) the clubhouse bathrooms clogged up, dirty and out of supplies, (ii) the common area washer/dryer area dirty and full of trash, and (iii) the grounds around the property littered with trash. (Berry Aff. ¶ 4, Plaintiff Depo., pp. 43-56). Plaintiff admits in his deposition that Mr. Berry had to continually counsel Plaintiff to correct these items. Id.

On October 6, 1998, Lawrence Berry and Steven Hayworth conducted a formal Maintenance Inspection of the entire Laurens Way property. (Hayworth Aff. ¶ 5, Berry Aff. ¶ 5). Formal Maintenance Inspections are unannounced and are completed at least once a year on all D&F-managed apartment communities. Id. During this inspection, Mr. Hayworth and Mr. Berry noticed numerous deficiencies in the overall maintenance of the property. Id. They reported their findings on D&F's standard Maintenance Inspection Report (the "Inspection Report"). Id. (See also Exhibit 2 to Berry Aff.) The Inspection Report yielded a score of 76 points out of a possible 95.5 points (or 80%), which fell under the second lowest grading scale entitled "Needs Improvement." Id. Mr. Hayworth and Mr. Berry provided Plaintiff with a copy of the Inspection Report and discussed with him the contents thereof. Id.

A day or so later, Mr. Berry hand delivered a letter to Plaintiff explaining that while there was a lot of work to do, everything on the Inspection Report could be rectified, and Mr. Berry had confidence that there would be improvement in the near future. (Berry Aff. ¶ 6, and Exhibit 1 thereto). Mr. Berry also asked Plaintiff in this letter to provide a response on how each of the maintenance deficiencies noted on the Inspection Report were corrected, and a plan for preventing these areas from going below standard in the future. Id. Nevertheless, Plaintiff never provided a response to the Inspection Report, nor did he provide a plan to prevent future maintenance lapses. Id. Plaintiff did,

however, go searching for a new job. (Plaintiff Depo., pp. 155-156).

In December 1998, without telling anyone at D&F, Plaintiff accepted a job as the Maintenance Superintendent at Laurel Springs Apartments. Id. Laurel Springs Apartments are located in Raleigh, North Carolina and managed by Post Properties, which has no relation to D&F. (Plaintiff Depo., p. 94). Plaintiff was supposed to begin working at Laurel Springs on December 21, 1998. Id. By letter dated December 7, 1998, Plaintiff gave Laurens Way a two-week resignation notice stating that his last day would be December 21, 1998 (the same day he started at Laurel Springs). (Hayworth Aff. ¶ 6; Berry Aff. ¶ 7 and Exhibit 3 thereto). However, Plaintiff did not remain at Laurens Way through December 21, 1998. Id. Instead, he walked off the job the week of December 14, 1998. Id. This left Laurens Way without a maintenance superintendent less than two weeks before Christmas. Id.

When a Maintenance Superintendent position becomes available at an apartment community, generally, the on-site resident manager, the Regional Property Manager, and the Regional Maintenance Coordinator will be involved in the search for, assessment of, and hiring of qualified candidates for the position. (Hayworth Aff. ¶ 7; Berry Aff. ¶ 8). D&F's policy and preference is to try to fill the position with someone currently working either at that community or another D&F community. Id. In keeping with that policy and preference, Lawrence Berry approved the hiring of Eugene Johnson, who is African-American, to replace Plaintiff as Superintendent at Laurens Way. Eugene Johnson was transferred and promoted from another D&F-managed apartment community, where he had been a maintenance technician. Id. Steven Hayworth had actually suggested to Lawrence Berry that he approve Eugene Johnson's transfer and promotion to Laurens Way. Id.

Two months after Plaintiff had resigned from Laurens Way, and while still working for Post Properties at Laurel Springs Apartments, Plaintiff contacted D&F's Vice President, Kellie Falk-Tillett, about being rehired as a Maintenance Superintendent with D&F. (Falk-Tillett Aff. ¶ 6; Plaintiff Depo., pp. 166-168). Mrs. Falk-Tillett was the Regional Property Manager for Laurens Way prior to Lawrence Berry and had actually approved Plaintiff's promotion to Laurens Way in 1997. (Falk-Tillett Aff ¶¶ 2, 6). Plaintiff claims in his deposition that he wanted to leave Laurel Springs Apartments

-4-

because he and his manager were not seeing "eye to eye on things." (Plaintiff Depo., p. 169). Plaintiff did not know if D&F even had openings for a Maintenance Superintendent, nor did he fill out an employment application for any such position. (Plaintiff Depo., p. 178-180). Likewise, Mrs. Falk-Tillett was not aware of any open Superintendent positions. (Falk-Tillett Aff. ¶ 6; Plaintiff Depo., p. 168). She was also not aware of the circumstances surrounding Plaintiff's resignation from Laurens Way. (Falk-Tillett Aff. ¶ 6). She therefore advised Plaintiff to contact Steven Hayworth, the Regional Maintenance Coordinator for apartment communities in North Carolina managed by D&F. Id.

Plaintiff then called Mr. Hayworth to express his desire to return to D&F. (Hayworth Aff. ¶ 8). Mr. Hayworth knew Plaintiff had just resigned two months earlier from Laurens Way without completing his two-week notice. Id. He was thus surprised that Plaintiff was seeking to return to D&F as a Maintenance Superintendent. Id. In addition, based on Plaintiff's performance at Laurens Way in the months before his resignation and his failure to respond to the Inspection Report, Mr. Hayworth did not feel comfortable placing Plaintiff in a Maintenance Superintendent position. Id. However, Mr. Hayworth was not aware of any openings at that time, and simply told Plaintiff he would see if any positions became available. Id. Plaintiff spoke to Mr. Hayworth two or three additional times during April and May 1999, but there were no openings during that period. Id.

The first opening for a Maintenance Superintendent at a D&F managed apartment community arose in June 1999 at Crosstimbers Apartments. (Hayworth Aff. ¶ 9). However, D&F never advertised or accepted outside applications for this position. Id. Consistent with company policy, D&F transferred James Blankenship from another D&F managed apartment community to take over at Crosstimbers. Id.

On June 1, 1999, Plaintiff quit his job at Laurel Springs Apartments without any advance notice to his manager, and without having found another job. (Plaintiff Depo., pp. 189-190). When asked in his deposition why he quit that job before he had found another one, he replied: "Well, I shot myself in the foot on that one." Id. About two weeks later, by letter dated June 17, 1999, Plaintiff notified D&F that he still wanted to work for a D&F-managed apartment community, and would be willing to work

in the State of Virginia, if necessary. (Hayworth Aff. ¶ 10, and Exhibit 2 thereto). Mr. Hayworth then met with Kellie Falk-Tillett and Lawrence Berry to discuss Plaintiff's letter and desire to return to D&F. Id. Mr. Hayworth asked Mr. Berry if he would consider hiring of Plaintiff for one of his apartment communities the next time an opening arose. (Hayworth Aff. ¶ 10; Berry Aff. ¶ 9). Mr. Berry said he would not be willing to hire Plaintiff as a Maintenance Superintendent since he felt Plaintiff had failed to give enough attention to detail when he supervised the maintenance at Laurens Way, Plaintiff had never provided a response to the Inspection Report, and Plaintiff had failed to honor his two-week notice of resignation during the middle of the holiday season. Id. After Kellie Falk-Tillett reviewed Plaintiff's employment file and spoke with Lawrence Berry and Steve Hayworth, she discovered for the first time that Plaintiff had failed to fulfill his two-week notice period. (Falk-Tillett Aff. ¶ 7). She then instructed Mr. Hayworth to tell Plaintiff in writing that he would not be considered for rehire as a Maintenance Superintendent due to his failure to fulfill his notice period, which Mr. Hayworth did by letter dated June 22, 1999. (Falk-Tillett Aff. ¶ 7, Hayworth Aff. ¶ 10 and Exhibit 3 thereto).

## ARGUMENT

I. **PLAINTIFF'S ALLEGATIONS AND EVIDENCE OF RACIAL DISCRIMINATION FAIL TO MEET THE STANDARD REQUIRED BY THE BURDEN SHIFTING SCHEME OF MCDONNELL-DOUGLAS AND, AS SUCH, SUMMARY JUDGMENT IN FAVOR OF D&F IS APPROPRIATE ON THIS ISSUE.**

As shown below, Plaintiff has failed to satisfy the evidentiary burdens incumbent upon him to surpass the summary judgment hurdle for Plaintiff's discrimination-in-hiring claim. To survive summary judgment, Plaintiff may satisfy either of two tests. First, Plaintiff may present direct evidence that race was a determining factor in Defendant's employment decisions. See Moyer v. Smurfit-Stone Container Corp., 2002 WL 31654526 (M.D.N.C. 2002). To do this, Plaintiff must present "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir.1995). Second, where Plaintiff is unable to present direct evidence of discrimination, Plaintiff may meet his

-6-

burden using circumstantial evidence, following the McDonnell Douglas burden-shifting scheme. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

Plaintiff has neither pleaded nor tendered any evidence - direct or indirect - that even hints at discriminatory attitude, animus, or intent. In fact, he cannot even identify one person at D&F he believes actually discriminated against him because of race:

> Q:    Is there any particular person at Drucker & Falk that you
> believe really discriminated against you because you were black in
> 1999?
>
> A:    No.

(Plaintiff Depo., p. 271).

Accordingly, the McDonnell Douglas framework is the only mechanism that could apply to Plaintiff's case. Under such deliberate scrutiny, Plaintiff's claims cannot survive and should be dismissed with prejudice.

### A.    Plaintiff has not made out a *prima facie* case of racial discrimination.

To establish a claim for discrimination-in-hiring based on race, the plaintiff must carry the initial burden of establishing a *prima facie* case of racial discrimination. McDonnell Douglas, 411 U.S. at 802. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. Id. Plaintiff has failed to meet this initial burden with regard to the second and fourth elements.

First, Plaintiff did not apply for a particular position for which D&F was seeking applicants. (Plaintiff Depo., p. 178-180). In February 1999, when Plaintiff contacted Kellie Falk-Tillett and Steven Hayworth about being rehired as a Maintenance Superintendent, neither Plaintiff, Mrs. Falk-Tillett, nor Mr. Hayworth knew of any openings. (Falk-Tillett Aff. ¶ 6; Hayworth Aff. ¶ 8, Plaintiff Depo., p. 168, 179). The first opening for a Maintenance Superintendent was at Crosstimbers Apartments located in

Morrisville, North Carolina. (Hayworth Aff. ¶¶ 8, 9). Plaintiff alleges in his complaint that Steven Hayworth told him about the Crosstimbers position and would refer Plaintiff's resume and application for that position. (Complaint ¶¶ 20, 21). However, that is inconsistent with Steven Hayworth's sworn testimony and Plaintiff's own sworn testimony. In his affidavit, Mr. Hayworth states that he did not become aware of the Crosstimbers position until June 1999, and that his last conversation with Plaintiff was in May 1999. (Hayworth Aff. ¶ 9). Further, Plaintiff admits in his deposition that he never filled out an application with D&F. (Plaintiff Depo., pp. 179-180). Finally, Plaintiff's own letter to D&F dated June 17, 1999 confirms that Plaintiff was never told of any open positions:

> "In February I spoke with Kellie Falk-Tillett about resuming my employment with Drucker & Falk, she suggested that I contact Steve Hayworth. After initial contact with Steve, he stated that nothing was available and he would keep me in mind for future employment. *I have been in contact with Steve on numerous occasions and still nothing is available* (emphasis added)."

(See Exhibit 2 to Hayworth Aff.). In fact, D&F never advertised or accepted outside applications for the Crosstimbers position. (Hayworth Aff. ¶ 9). Consistent with D&F's policy and preference of trying to fill Superintendent positions with current employees, D&F transferred James Blankenship to Crosstimbers from another apartment community managed by D&F, where he had been the Superintendent. Id.

Plaintiff not only failed to apply for a job for which D&F was seeking applicants, Plaintiff was not qualified to be rehired as a Maintenance Superintendent. Plaintiff acknowledges that a Maintenance Superintendent must continually inspect buildings, grounds and common areas to identify needed preventive maintenance and to insure that the buildings and common areas are clean. (Plaintiff Depo., pp. 138-139). He then admits that the buildings, grounds and common areas at Laurens Way were frequently not kept clean during his tenure as Superintendent. (Plaintiff Depo. pp. 43-56, 113-123). In addition, Plaintiff acknowledges that giving two weeks notice of resignation "is the right thing to do, especially when you want to be hired back into a company." (Plaintiff Depo. pp. 157-158). He then admits he failed to honor his two-week notice to Laurens Way. Id. Plaintiff's spotty performance

-8-

as Superintendent along with his unprofessional conduct in failing to honor his two-week notice period made Plaintiff unqualified to return to D&F as a Superintendent. As shown above, Plaintiff has failed to establish a *prima facie* case of race discrimination, and Plaintiff's claims should be dismissed on that basis.

**B.      D&F has successfully demonstrated legitimate, non-discriminatory reasons for refusing to consider rehiring Plaintiff.**

If the plaintiff is able to establish a *prima facie* case of discrimination, the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for its action. See *McDonnell Douglas* at 802-04. The defendant's burden is one of production, not persuasion. See *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 274-75 (4th Cir. 1995).

Plaintiff has not established a *prima facie* case of discrimination. Even if the Court finds otherwise, D&F has demonstrated legitimate, non-discriminatory reasons for refusing to consider rehiring Plaintiff as a Maintenance Superintendent. First, in the months before he resigned as Superintendent of Laurens Way, Lawrence Berry had to counsel Plaintiff numerous times about the condition of the property. (Berry Aff. ¶ 4, Plaintiff Depo., pp. 43-56). Second, Lawrence Berry and Steven Hayworth found multiple deficiencies in the maintenance and upkeep of the property during the formal maintenance inspection on October 6, 1998. (Hayworth Aff. ¶ 5, Berry Aff. ¶ 5 and Exhibit 2 thereto; Plaintiff Depo., pp. 113-123). Then, Plaintiff ignored the requests of his supervisors to provide a response on how each of the maintenance deficiencies noted on the Inspection Report were corrected, and a plan for preventing these areas from going below standard in the future. (Berry Aff. ¶ 6, and Exhibit 1 thereto). Third, Plaintiff had quit his position as a Maintenance Superintendent only a few months before. (Hayworth Aff. ¶ 6; Berry Aff. ¶ 7 and Exhibit 3 thereto). Fourth, when Plaintiff left Laurens Way, he only gave two weeks notice and then failed to finish the two-week period, leaving Laurens Way without a Superintendent in the middle of the Holiday season. Id. Fifth, with regard to the Crosstimbers Superintendent position, D&F hired a qualified employee from within the company consistent with its policy. (Hayworth Aff. ¶ 9). D&F has thus met its burden to demonstrate

-9-

legitimate, non-discriminatory reasons for refusing to consider rehiring Plaintiff as a Maintenance Superintendent.

### C. Plaintiff has failed to demonstrate that D&F's justifications for refusing to consider rehiring Plaintiff as a Maintenance Superintendent were pretextual.

Because D&F has offered legitimate, non-discriminatory reasons which would, if believed by the fact-finder, support its actions, the burden shifts back to Plaintiff to "establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.'" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000) (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, (1981)). The Fourth Circuit has held that, to establish that an employer's justification is pretext for discrimination, a plaintiff must prove "'*both* that the reason was false, and that discrimination was the real reason' for the challenged conduct." DeJarnette v. Corning Inc., 133 F.3d 293, 298 (4th Cir.1998) (quoting Jiminez v. Mary Washington College, 57 F.3d 369 (4th Cir.1995))

Plaintiff has produced no evidence to show D&F's reasons for refusing to consider rehiring Plaintiff were false. In fact, Plaintiff specifically admits that Lawrence Berry had to counsel him numerous times about the condition of the property between September and December 1998. (Plaintiff Depo. pp. 43-56). Plaintiff also admits there were multiple deficiencies in the upkeep of the property during the formal Maintenance Inspection on October 6, 1998. (Plaintiff Depo. pp. 113-123). Further, Plaintiff acknowledges that giving two weeks notice of resignation "is the right thing to do, especially when you want to be hired back into a company." (Plaintiff Depo. pp. 157-158). He then admits that he failed to honor his two-week notice to Laurens Way. Id. Incidentally, Plaintiff also failed to give Laurel Springs Apartments any notice before he quit from that apartment community. (Plaintiff Depo., pp. 189-190).

Plaintiff has also failed to produce any evidence of intentional discrimination. Plaintiff has failed to produce any evidence tending to prove that the persons who made the decisions upon which Plaintiff bases his claims for race discrimination were motivated by race in making these decisions. In

-10-

fact, Plaintiff admits that there is no one at D&F he actually believes discriminated against him because of race. (Plaintiff Depo., p. 271). Plus, after Plaintiff quit at Laurens Way, both Lawrence Berry and Steven Hayworth approved the transfer and promotion of an African-American, Eugene Johnson, as Plaintiff's replacement. (Hayworth Aff. ¶ 7, Berry Aff. ¶ 8).

The only explanation Plaintiff provides for his claim of discrimination is his belief that D&F rehired five white individuals, Chris Seagrove, Denise Cook, Mike Hudda, Tony Bains, and Ralph Ray, who had "walked off their jobs, either prior to the completion of a notice period, or with no notice period given whatsoever." (Complaint ¶¶ 32-37, Plaintiff Depo., p. 261). However, Plaintiff admits in his deposition that he has no idea whether Denise Cook, Mike Hudda, Tony Bains and Ralph Ray gave advance notice of resignation or whether they completed their notice period. (Plaintiff Depo., pp. 225, 254, 257, 258, 260, 261). In fact, each of these individuals did give two-weeks notice before they resigned, and they each completed the two-week period. (Falk-Tillett Aff. ¶¶ 3, 4; Hayworth Aff. ¶ 12; Welch Aff. ¶ 2; Waddill Aff. ¶ 2). The only one of these individuals who resigned without giving and completing two-weeks notice was Chris Seagroves. (Hayworth Aff. ¶ 13). Before his resignation, Mr. Seagroves had been the Maintenance Superintendent at the Groves Apartments, which are also managed by D&F. Id. Mr. Seagroves resigned because he felt he could not handle the responsibility of being Superintendent at that property (Plaintiff Depo., p. 229). Mr. Seagroves, though, was not hired back as a Maintenance Superintendent. He was subsequently hired at Laurens Way as Plaintiff's maintenance assistant, which is a lower paying and less responsible position. (Hayworth Aff. ¶ 13) Furthermore, Plaintiff admits that Mr. Seagroves performed well as his assistant (Plaintiff Depo., p. 231). In sum, Plaintiff cannot show that similarly situated white individuals were treated any differently than Plaintiff was treated.

Plaintiff has failed to make out the elements of a *prima facie* case for his race discrimination-in-hiring claim. Summary judgment in favor of D&F would be proper on that ground alone. Furthermore, Plaintiff has failed to rebut D&F's legitimate, non-discriminatory reasons for refusing to consider rehiring Plaintiff. Not only has Plaintiff failed to offer evidence showing that these reasons

-11-

were mere pretext, he has failed to offer any evidence tending to demonstrate that discrimination was the "real reason" for the decision. Summary judgment in favor of D&F is, therefore, appropriate.

## II.    PLAINTIFF HAS NOT SUFFICIENTLY PLEAD NOR DEMONSTRATED A CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

In order to state a claim for negligent infliction of emotional distress under North Carolina law, a plaintiff must allege in his complaint that "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress (often referred to as "mental anguish"), and (3) the conduct did in fact cause the plaintiff severe emotional distress." Johnson v. Ruark Obstetrics & Gynecology Assoc., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990). Plaintiff failed to allege in his complaint any of the required elements of the claim of negligent infliction of emotional distress, and the same should be dismissed. (See Delk v. Arvin Meritor, Inc., 179 F.Supp.2d 615, 626 (W.D.N.C. 2002) "*North Carolina requires that a plaintiff asserting a claim for negligent infliction of emotional distress plead and prove that it was reasonably foreseeable to the defendants that the plaintiff could suffer severe emotional distress as a result of their conduct.*").

Even if Plaintiff's pleading was sufficient, he has not produced or forecast any evidence to show that he suffered from severe emotional distress. Although Plaintiff may have felt rejected and disappointed in learning he would not be considered for rehire as a Superintendent (see Plaintiff Depo., p. 271), rejection and disappointment do not amount to severe emotional distress. Plaintiff must show that he suffered from "neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Johnson, 327 N.C. at 304, 395 S.E.2d at 97. However, Plaintiff actually admits in his deposition that he never suffered any severe emotional distress:

> Q:    You never went to see a doctor about any distress, did you?
>
> A:    No.

-12-

> Q:      Were you ever diagnosed by any doctor for any type of
> emotional distress?
>
> A:      No.
>
> Q:      Did you ever suffer any symptoms at all of distress?
>
> A:      No.

(Plaintiff Depo., p. 272).

Since Plaintiff has failed to establish that he suffered from severe emotional distress, D&F respectfully contends that summary judgment in its favor as to this cause of action is appropriate.

### III.      PLAINTIFF HAS NOT SUFFICIENTLY PLEAD NOR DEMONSTRATED A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must prove that defendant engaged in (1) extreme and outrageous conduct, (2) which was intended to cause, (3) and did in fact cause severe emotional distress. Dickens v. Puryear, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). Extreme and outrageous conduct has been described as conduct which is "utterly intolerable in a civilized community." Hogan v. Forsyth Country Club Co., 79 N.C.App. 483, 493, 340 S.E.2d 116, 123 (1986). Plaintiff failed to plead any of these elements in his Verified Complaint, thereby warranting dismissal of this claim.

Further, Plaintiff has failed to establish that any conduct attributable to D&F was "utterly intolerable in a civilized community." The only conduct he even makes reference to is D&F's refusal to consider his rehiring. (Plaintiff Depo., p. 272). However, refusing to consider Plaintiff for rehire to a position from which he just resigned under the conditions described above is not only tolerable, but justified. In addition, Plaintiff admits in his deposition that no one at D&F actually intended Plaintiff to suffer distress:

> Q:      You think somebody at Drucker & Falk actually meant for
> you to suffer distress?
>
> A:      Do I think they meant it?
>
> Q:      Yes. Do you think somebody at Drucker & Falk actually

intended that you suffer some deep, severe emotional distress?

A:     No.

(Plaintiff Depo., p. 273). Finally, as explained above, Plaintiff has failed to establish that he suffered from severe emotional distress. As such, D&F respectfully contends that summary judgment in its favor as to this cause of action is appropriate.

## IV.     PLAINTIFF HAS NOT SUFFICIENTLY PLEAD NOR DEMONSTRATED A CLAIM FOR WRONGFUL TERMINATION

To prevail on a claim for wrongful termination under North Carolina law, a plaintiff must allege and prove that (i) he either participated in conduct protected by law or refused to participate in conduct which violated public policy, and (ii) his participation in protected conduct or refusal to participate in unlawful conduct or which violated public policy was a substantial factor in defendant's decision to terminate the plaintiff's employment. See *e.g. Brooks v. Stroh Brewery Co.*, 95 N.C.App. 226, 230, 382 S.E.2d 874, 878, disc. review denied, 325 N.C. 704, 388 S.E.2d 449 (1989).

Plaintiff failed to allege in his complaint, and failed to produce any evidence to support any of the required elements of this claim. Furthermore, and most obvious, Plaintiff admits that he voluntarily resigned, thereby precluding any claim based on termination.

## CONCLUSION

D&F is entitled to judgment as a matter of law on all claims brought by Plaintiff because Plaintiff has failed to plead or demonstrate a *prima facie* case of race discrimination; Plaintiff cannot show D&F's justifications for refusing to rehire Plaintiff were pretexts for discrimination, and Plaintiff has failed to plead or produce any evidence to support claims of negligent infliction of emotional distress, intentional infliction of emotional distress, or wrongful discharge under state law. Since all of Plaintiff's claims fail, Defendant D&F respectfully requests that summary judgment be granted in its favor as to all claims.

This is the 27 day of February, 2003.

_Keith A. Satisky_
Keith A. Satisky
State Bar No. 20972
Attorneys for Defendant
Satisky & Silverstein, LLP
900 Ridgefield Dr., Suite 250
Raleigh, NC 27609
Tel: (919) 790-9102
Fax: (919) 790-1560

**CERTIFICATE OF SERVICE**

This is to certify that the undersigned has this date served this pleading or paper in the foregoing matter on counsel of record for all other parties to this cause by depositing a copy of same in the United States Mail, postage prepaid, in the manner prescribed by Rule 5 of the Federal Rules of Civil Procedure, addressed to the following:

Charles J. Hutson, Esq.
116 West Main Street
Durham, NC 27701

This is the 2̲7̲ day of _Kebruary_, 2003.

_Keith G Satisky_

Keith A. Satisky
NCSB No. 20972
Satisky & Silverstein, LLP
Attorneys for Defendant
900 Ridgefield Dr., Suite 250
Raleigh, NC 27609
Tel: (919) 790-9102
Fax: (919) 790-1560

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO. 5:02-CV-227-BR(3)

TONY JOHNSON,          )
       Plaintiff,      )
                    )    **APPENDIX TO MEMORANDUM**
    vs.              )    **OF LAW IN SUPPORT OF DEFENDANT'S**
                    )    **MOTION TO DISMISS, OR, IN THE**
DRUCKER & FALK, LLC,    )    **ALTERNATIVE, FOR SUMMARY JUDGMENT**
       Defendant.     )

**TAB**        **DOCUMENT**

1.       Exhibit 1 – Plaintiff's EEOC Charge

2.       Exhibit 2 – EEOC Dismissal and Notice of Rights

3.       Affidavit of Steven Hayworth, Regional Maintenance Coordinator, D&F

4.       Affidavit of Lawrence Berry, former Regional Property Manager, D&F

5.       Affidavit of Kellie Falk-Tillett, Vice President, D&F

6.       Affidavit of Howard Waddill, Regional Maintenance Supervisor, D&F

7.       Affidavit of Gerald Welch, Maintenance Superintendent, D&F

8.       Excerpts from Plaintiff's Deposition

g:\d&f\Johnson\appendix-memoran.doc

| | CHARGE OF DISCRIMINATION | | | AGENCY | CHARGE NUMBER |
|---|---|---|---|---|---|

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

☐ FEPA
☒ EEOC

_____ and EEOC

*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. Tony E. Johnson | (919) 845-5191 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 6520-108 Golden Lantern Court, Raleigh, NC 27613 | | 07/15/1963 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| DRUCKER & FALK, LLC | Cat D (501 +) | (919) 846-7300 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 7200 STONEHENGE DRIVE, SUITE 211, RALEIGH, NC 27613-1620 | | 183 |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 06/22/1999 | 06/22/1999 |

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

I. On or about June 22, 1999, I was informed that I would not be hired for a position with Drucker & Falk, LLC. I had previously been employed by the company from August 7, 1995 through December. The company employs several locations.

II. In a letter dated June 22, Steven Haywood, Maintenance Coordinator, stated that I had previously left their employ without completeing my two weeks notice.

I have not seen a formal policy regarding rehire. I believe the company rehires persons who had previously worked for them if their performance was good.

III. I beleive I was discriminated against due to my race/Black in violation of Title VII of the Civil Rights Act of 1964, as amended.

RECEIVED
U.S. E.E.O.C.
RALEIGH AREA OFFICE
16 JUN 28 PM '99

**EXHIBIT**

1

| ☐ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - *(When necessary for State and Local Requirements)* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | |
| 12-16-99 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Month, day and year)* |
| Date          Charging Party *(Signature)* | |

# DISMISSAL AND NOTICE OF RIGHTS

| To: Tony Johnson<br>604 KEY WEST MEWS<br>CARY, NC 27513 | From: E.E.O.C<br>Raleigh Area Office<br>1309 Annapolis Drive<br>Raleigh, NC 27608-2129 |
|---|---|

☐ *On behalf of a person aggrieved whose identity is CONFIDENTIAL ( 29 C.F.R. 1601.7(a) )*

| Charge Number | EEOC Representative | Telephone Number |
|---|---|---|
| 141A00150 | Thomas M. Colclough | (919) 856-4075 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ We cannot investigate your charge because it was not filed within the time limit required by law.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You had 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)* _____

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this Notice; otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On Behalf of the Commission

*Richard E. Walz*                    6/16/0ɜ
Richard E. Walz, Director              *(Date)*

Enclosure(s)

cc: DRUCKER & FALK, LLC
7200 STONEHENGE DRIVE
SUITE 211
RALEIGH, NC 27613-1620

EXHIBIT
2

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO. 5:02-CV-227-BR(3)

| | | |
|---|---|---|
| TONY JOHNSON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **AFFIDAVIT OF STEVEN HAYWORTH** |
| | ) | |
| DRUCKER & FALK, LLC, | ) | |
| Defendant. | ) | |

The undersigned, Steven Hayworth, being first duly sworn, deposes and says that:

1.      I am a resident of Wake County, North Carolina.

2.      Since May 1998, I have been a Regional Maintenance Coordinator for Drucker & Falk, Inc. As Regional Maintenance Coordinator, I help coordinate and assist with maintenance issues and personnel at apartment communities located in North Carolina managed by Drucker & Falk, LLC ("D&F").

3.      The Maintenance Superintendents (sometimes called Supervisors) at apartment communities managed by D&F are responsible for all upkeep, maintenance and repair work at their apartment community. As shown on the Superintendent job description attached hereto as **Exhibit 1**, which is part of D&F's Property Operations Manual, part of the Maintenance Superintendent's primary responsibilities are to continually inspect buildings, grounds and common areas to identify needed preventive maintenance and to insure that the buildings and common areas are clean.

4.      I am familiar with the employment record of Tony Johnson, the Plaintiff in the above-styled case. Tony Johnson was hired on August 7, 1995 as a maintenance technician at Stonehenge Apartments in Raleigh, North Carolina, which is an apartment community managed by D&F. Maintenance technicians work under the Superintendents and perform maintenance and repair work at the community. On July 15, 1997, Mr. Johnson was transferred to Laurens Way Apartments ("Laurens Way") where he was promoted to the position of Maintenance Superintendent. Laurens Way, located in Knightdale, North Carolina, is another apartment community managed by D&F.

5.     On October 6, 1998, I, along with Lawrence Berry, then the Regional Property Manager with management responsibility over Laurens Way, conducted a formal Maintenance Inspection of the entire Laurens Way property. A formal Maintenance Inspection is unannounced and is completed at least once a year on all D&F-managed apartment communities. During this inspection, Mr. Berry and I noticed numerous deficiencies in the overall maintenance of the property. Mr. Berry and I reported the findings of our inspection on D&F's standard Maintenance Inspection Report (the "Inspection Report"). The Inspection Report yielded a score of 76 points out of a possible 95.5 points (or 80%). This score fell under the grading scale entitled "Needs Improvement," which, as shown on the Inspection Report, is the second lowest on a five level grading scale. Mr. Berry and I provided Tony Johnson with a copy of the Inspection Report and discussed the contents thereof with Mr. Johnson.

6.     By letter dated December 7, 1998, Tony Johnson gave a two-week resignation notice stating that his last day would be December 21, 1998. Despite his notice, Tony Johnson did not remain on the job at Laurens Way through December 21, 1999. Instead, Tony Johnson walked off the job the week of December 14, 1998, leaving Laurens Way unexpectedly without a maintenance supervisor less than two weeks before Christmas, which is a busy time of year in the maintenance of an apartment community.

7.     When a Maintenance Superintendent position becomes available at an apartment community managed by D&F, generally the on-site resident manager, the Regional Property Manager, and the Regional Maintenance Coordinator will be involved in the search for, assessment of, and hiring of qualified candidates for the position. D&F's policy and preference is to try to fill the position with someone currently working either at that community or another D&F community. In keeping with that policy and preference, Eugene Johnson, who is African-American, was hired to replace Tony Johnson as Superintendent at Laurens Way. Eugene Johnson was transferred and promoted from another D&F-managed apartment community, where he had been a maintenance technician. I had actually suggested to Lawrence Berry that he approve Eugene Johnson's transfer and promotion to Laurens

-2-

Way, which he did.

8.     In or about February 1999, Mr. Johnson contacted me about being rehired at an apartment community managed by D&F. Mr. Johnson had not filled out an employment application for any particular position, and did not mention a particular position he was interested in, nor a particular location where he wanted to work. Although he did not specifically mention it, I assumed he was looking for another Maintenance Superintendent position. Frankly, I was surprised that Mr. Johnson was seeking to return to the company as a Superintendent since he had just resigned two months earlier without completing his two-week resignation notice. In addition, based on his performance at Laurens Way in the months before his resignation, and his failure to respond to the Inspection Report, I did not feel comfortable placing Mr. Johnson in a Maintenance Superintendent position. Regardless, I was not aware of any openings for a Superintendent, and simply told Mr. Johnson that I would see if any positions became available. Mr. Johnson and I spoke two or three additional times during April and May 1999, but I was not aware of any openings for a Superintendent during that period.

9.     Contrary to allegations contained in Tony Johnson's complaint, at no time did I ever indicate to him that a Maintenance Superintendent position had become available at Crosstimbers Apartments in Morrisville, North Carolina. The first time I became aware of such an opening was in early June 1999, when Stacy Frazier, then Maintenance Superintendent, gave notice of resignation. This was after my last conversation with Tony Johnson. Further, D&F never advertised or accepted outside applications for this position. Consistent with company policy and preference, D&F transferred James Blankenship from another D&F community to replace Mr. Frazier at Crosstimbers. James Blankenship had been the Maintenance Superintendent at the Groves Apartments in Raleigh, North Carolina.

10.     I then received a letter from Tony Johnson dated June 17, 1999, a true copy of which is attached hereto as **Exhibit 2**, in which Mr. Johnson again expressed his desire to work at a D&F-managed community and also a willingness to work in Virginia. He also asked for a written response if

-3-

he was not going to be considered for rehire. I then met with Kellie Falk-Tillett and Lawrence Berry to discuss Mr. Johnson's letter and desire to return to D&F. I asked Lawrence Berry if he would consider hiring Mr. Johnson for one of his apartment communities the next time an opening arose. Mr. Berry told me that he would not be willing to hire Mr. Johnson as a Maintenance Superintendent since he felt Plaintiff had failed to give enough attention to detail when he supervised the maintenance at Laurens Way, Mr. Johnson had never provided a response to the Inspection Report, and Mr. Johnson had failed to honor his two-week notice of resignation in the middle of the holiday season. Mrs. Falk-Tillett, Mr. Berry, and I then reviewed Mr. Johnson's employment file. After Mrs. Falk-Tillett discovered that Plaintiff had failed to fulfill his two-week notice period, she instructed me to tell Mr. Johnson in writing that he would not be considered for rehire as a Maintenance Superintendent due to his failure to fulfill his notice period   Thereupon, by letter dated June 22, 1999, a true copy of which is attached hereto as **Exhibit 3**, I informed Mr. Johnson that he would not be considered for rehire due to his failure to fulfill his notice period.

11.    Mr. Johnson's race was not a factor in the decision not to consider Mr. Johnson for rehire as a Maintenance Superintendent.

12.    I am familiar with the employment record of Ralph Ray. Mr. Ray resigned in May 1998 as the Maintenance Superintendent of Quail Ridge Apartments in Raleigh, North Carolina, which are managed by D&F. He had worked for D&F for approximately twenty years, and, in my opinion, was one of the best Maintenance Superintendents at D&F. I have personal knowledge that Mr. Ray gave two-weeks notice before he resigned and that he fulfilled his two-week notice period. Consistent with my own recollection is the Payroll Information & Record for Ralph Ray completed May 21, 1998, a true copy of which is attached hereto as **Exhibit 4**, which shows Mr. Ray gave notice of resignation with his last day being May 21, 1998. Payroll Information & Records are regularly kept for each employee in the regular course of D&F's business to reflect any changes in an employee's payroll status, and are prepared at or near the time the change takes place. In June 1999, Mr. Ray was hired as the Maintenance Superintendent at Wedgewood Apartments, which are managed by

-4-

D&F.

13.    I am familiar with the employment record of Chris Seagroves.  In 1996, Mr. Seagroves resigned as the Maintenance Superintendent of the Groves Apartments located in Raleigh, North Carolina, which are managed by D&F.    According to Mr. Seagroves, he resigned because he felt he could not handle the responsibility of being Superintendent at that property.  Mr. Seagroves resigned without giving and completing two-weeks notice.  In December 1997, Mr. Seagroves was hired at Laurens Way as Tony Johnson's maintenance assistant.  A maintenance assistant receives less pay and has less responsibility than a Maintenance Superintendent.

14.    I know the matters stated herein of my own knowledge, except as to those matters stated on information and belief and as to those I believe them to be true.  In addition, I am over twenty-one, under no disability, and am competent to testify to the matters stated herein.



_____
Steven Hayworth

Sworn to and subscribed before me this

27th day of February, 20 03.

_____
NOTARY PUBLIC

My Commission Expires: 9/27/05

g:\d&f\johnson\aff-sh.doc

BRENDA P MILAM
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 9-27-2005

-5-



Personnel



EXHIBIT
1

## Scope and Purpose

The Superintendent/Chief Engineer is responsible for the physical upkeep of the property. He/she must maintain and operate all mechanical equipment excluding those specifically designated for "contract" repair and service. The Superintendent/Chief Engineer must supervise all maintenance employees. He/she is under the direction of the resident manager.

## Duties and Responsibilities

1. Train and be responsible for work performed by all staff members under his/her direction.

2. Hire and terminate employees in accordance with Drucker & Falk, LLC policy and under the direction of the resident manager.

3. Counsel maintenance employees to improve their work and work attitudes.

4. Establish schedules and assign personnel routine maintenance tasks.

5. Make certain that the community has maintenance coverage at all times in case of emergencies or emergency work requests.

6. Perform all duties with the highest consideration for safety, and train and be responsible for all staff members to do so as well.

7. Continually inspect buildings, grounds, and common areas to identify needed preventive maintenance, maintenance, to insure that the buildings and common areas are clean and that the grounds are being properly maintained, and to identify current and potential safety hazards.

8. Maintain a clean, safe, and well organized shop and equipment storage area.

9. Operate and maintain furnaces, AC equipment, auxiliaries, and other equipment in the buildings, as well as maintenance and grounds equipment. Insure that all equipment is operating in a safe and efficient manner.

10. Replace air filters as required.

11. Perform necessary maintenance and repairs in apartments with work orders.

12. Strive to see that all work orders are completed within 24 hours.

13. Ready vacant apartments for occupancy following Drucker & Falk, LLC guidelines.

14. Schedule contractors for maintenance related work.

D 0121

15. Secure bids and proposals as directed.

16. Use contract labor whenever it becomes cost effective, following approval by the Resident Manager or Property Manager.

17. Strictly follow established budgetary guidelines.

18. Follow all Drucker & Falk, LLC purchasing directives and procedures.

19. Maintain operating manuals, warranty records, and other materials pertaining to general inventory and parts replacement and availability.

20. Keep abreast of developments in the field, including new products, and new and less expensive ways of making repairs.

21. Always maintain the highest standards of resident relations.

PERSONNEL                    MAIN                    GENERAL MAINTENANCE
TABLE OF CONTENTS            TABLE OF CONTENTS

D 0122

EXHIBIT

2

June 17, 1999

Mr. David C. Falk, Sr.
Mrs. Kellie Falk-Tillett
Mr. Jere Buch
Mr. Steve Hayworth
7200 Stonehenge Drive
Suite 211
Raleigh, NC 27613

Dear Steve:

August 7, 1995, until July 14, 1997, I worked as a maintenance technician at Stonehenge Apartments and on July 15, 1997 I was transferred to Laurens Way Apartments with the title of maintenance supervisor until December 17, 1998.

The three years I was employed with Drucker & Falk was rewarding, not only was my career enhanced but it made me a model employee, and for this I'm grateful.

For many reasons I could not work at Laurens Way under the supervision of Mr. Berry and decided that it would be in my best interest to leave the company with a two week notice.

In February I spoke with Kellie Falk-Tillett about resuming my employment with Drucker & Falk, she suggested that I contact Steve Hayworth. After initial contact with Steve, he stated that nothing was available and he would keep me in mind for future employment. I have been in contact with Steve on numerous occassion and still nothing is available. At this time I request to relocate to Virginia for employment. If I'm not considered for employment please respond with reason at the address below.

Your response is greatly appreciate

Tony E. Johnson
1201 Broken Arrow Court
Box 186
Raleigh, NC 27610
(919) 274-4254

Sincerely,

Tony E. Johnson

D 0022

cc: David C. Falk, Sr.
     Kellie Falk-Tillett
     Steve Hayworth

 

**DRUCKER & FALK, LLC**
R E A L   E S T A T E

7200 Stonehenge Drive, Suite 211, Raleigh, NC 27613-1620  Tel: (919) 846-7300  FAX: (919) 846-9771

June 22, 1999

Mr. Tony E. Johnson
1201 Broken Arrow Court
Box 186
Raleigh, NC 27610

Dear Tony:

The purpose of this letter is to respond to your request for re-employment with Drucker & Falk. After thoughtful deliberation it has been decided that you may not be considered for rehire.

Although your three years of service with the company is appreciated, review of your employee file indicates that you never finished out the full two weeks of your notice. Not only was this action on your part unprofessional, but it put the other employees of Laurens Way in a predicament leaving them short staffed during the busy holiday season.

I trust that this answers any questions you may have had and I wish you luck in your future endeavors.

Sincerely,

**DRUCKER & FALK, LLC**
**Drucker & Falk, Inc., its Manager**


Steven Hayworth
Maintenance Coordinator

SH/sy

c:   Jere Buch
     David C. Falk
     Kellie Falk-Tillett

D 0021

Regional Offices in - Atlanta, Georgia · Orlando, Florida · Newport News, Virginia · Raleigh, North Carolina · Wilmington, North Carolina
MULTI-FAMILY MANAGEMENT · COMMERCIAL SALES & LEASING · COMMERCIAL MANAGEMENT · SENIOR LIVING · DEVELOPMENT · INSURANCE



# DRUCKER & FALK

## PAYROLL INFORMATION & RECORD

PROPERTY SITE _Quail Ridge_      DATE COMPLETED _5-21-18_

**PURPOSE OF REPORT (CHECK ONE BLOCK)**

☐ PERMANENT TRANSFER BETWEEN SERVICES RENDERED PROPERTIES (COMPLETE 1, 1A, 2, 10)
☐ SET UP NEW EMPLOYEE (COMPLETE ITEMS 1 THROUGH 10)
☐ INFORMATION CHANGE, EXISTING EMPLOYEE (COMPLETE ITEMS 1, 2 AND ITEM TO BE CHANGED)
☒ EMPLOYEE TERMINATION (COMPLETE ITEMS 1, 2 and 11)

1. EMPLOYEE FILE NO. _1850-155_      1A. HOME DEPARTMENT _1850_

2. EMPLOYEE NAME _Ralph Ray_
   ADDRESS _3645 Castlegate Dr._
   CITY _Raleigh_      STATE _NC_      ZIP _27604_

3. SOCIAL SECURITY NO. _____      DATE OF BIRTH _____

4. EFFECTIVE DATE OF (EMPLOYMENT, CHANGE, TRANSFER) . . . . . . . . . . . . . . . . . . . . _____

5. SALARY INFORMATION: SALARIED (ENTER AMOUNT PER PERIOD) . . . . . . . . . . . $ _____
   OR
   HOURLY, ENTER, HOURLY RATE . . . . . . . . . . . . . . . . . . . $ _____ /HR.

6. TAX INFORMATION:      CIRCLE MARRIED (M) OR SINGLE (S) . . . . . . . . . . . . . . . . . . _M OR S_
   (W - 4 FORMS MUST BE ATTACHED)
   STATE CODE (ABBREVIATE STATE NAME) . . . . . . . . . . . . . _____
   STATE EXEMPTIONS (IF APPLICABLE) . . . . . . . . . . . . . . . . . . # _____
   FEDERAL EXEMPTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . # _____

7. OTHER DEDUCTIONS: DOES EMPLOYEE WANT:
   (CIRCLE YES OR NO)
   1. HOSPITAL INSURANCE . . . . . . . . . . . . . . . . YES    NO    #1    _____
   2. _____    YES    NO    _____
   3. _____    YES    NO    _____

8. JOB CLASSIFICATION:  ☐ FULL - TIME   OR   ☐ PART - TIME   OR   ☐ TEMPORARY

9. LIFE INSURANCE CODE: (CIRCLE ONE NUMBER) 1 2 3 4 5 6 7   (FULL TIME POSITIONS ONLY)

10. TRANSFER FROM ANOTHER SITE - NAME OF SITE _____
    ACCRUED VACATION BEING TRANSFERRED _____ HRS.   ACCRUED SICK LEAVE _____ HRS.

11. EMPLOYEE TERMINATION - LAST DAY WORKED _5/30/98_
    HOURS OF ACCRUED VACATION PAID ON FINAL PAY _____ HRS.
    REASON FOR TERMINATION _Gave notice_

    _____          _Karen Anderson_
    SIGNATURE OF EMPLOYEE          SIGNATURE OF SUPERVISOR

NOTE: IF THE EMPLOYEE WAS TRANSFERRED FROM ANOTHER SITE, ITEM 11 ABOVE MUST ALSO BE COMPLETED.

FORM NO. 6 11/93 5M          OFFICE FILE

**EXHIBIT**
**4**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER   D 0326

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO. 5:02-CV-227-BR(3)

| | | |
|---|---|---|
| TONY JOHNSON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **AFFIDAVIT OF LAWRENCE BERRY** |
| | ) | |
| DRUCKER & FALK, LLC, | ) | |
| Defendant. | ) | |

The undersigned, Lawrence Berry, being first duly sworn, deposes and says that:

1.      I am a resident of Wake County, North Carolina.

2.      Between March 1996 and February 2002, I was a Regional Property Manager employed by Drucker & Falk, Inc. As Regional Property Manager, I had responsibility for the overall operations of multiple apartment communities managed by Drucker & Falk, LLC ("D&F"), including assisting in personnel hiring decisions for the communities.

3.      The Maintenance Superintendents (sometimes called Supervisors) at apartment communities managed by D&F are responsible for all upkeep, maintenance and repair work at their apartment community.   Part of the Maintenance Superintendent's primary responsibilities are to continually inspect buildings, grounds and common areas to identify needed preventive maintenance and to insure that the buildings and common areas are clean.

4.      In or about September 1998, I became the Regional Property Manager for multiple apartment communities managed by D&F, including Laurens Way Apartments ("Laurens Way") in Knightdale, North Carolina.  At that time, Tony Johnson was Maintenance Superintendent for Laurens Way.  During numerous visits to Laurens Way between September and December 1998, I found (i) the clubhouse bathrooms clogged up, dirty and out of supplies, (ii) the common area washer/dryer area dirty and full of trash, and (iii) the grounds around the property littered with trash.  I had to continually counsel Mr. Johnson to correct these items.

5.      On October 6, 1998, I, along with Steven Hayworth, then a Regional Maintenance Coordinator for apartment communities managed by D&F, conducted a formal Maintenance

Inspection of the entire Laurens Way property. Formal Maintenance Inspections are unannounced and are completed at least once a year on all D&F-managed apartment communities. During this inspection, Steven Hayworth and I noticed numerous deficiencies in the overall maintenance of the property. Mr. Hayworth and I reported the findings of our inspection on D&F's standard Maintenance Inspection Report (the "Inspection Report"), a true of copy of which is attached to this Affidavit as **Exhibit 2** and incorporated herein by reference. The Inspection Report yielded a score of 76 points out of a possible 95.5 points (or 80%). This score fell under the grading scale entitled "Needs Improvement," which, as shown on the Inspection Report, is the second lowest on a five level grading scale. Mr. Hayworth and I provided Tony Johnson with a copy of the Inspection Report and discussed the contents thereof with Mr. Johnson.

6.     A day or so later, I hand delivered a letter to Tony Johnson, a true copy of which is attached to this Affidavit as **Exhibit 1** and incorporated herein by reference. In this letter, I told Tony Johnson that while there was a lot of work to do, everything on the Inspection Report could be rectified, and that I had confidence that there would be improvement in the near future. I also asked Mr. Johnson in this letter to provide, no later than October 30, 1998, (i) a response on how each of the maintenance deficiencies noted on the Inspection Report were corrected, and (ii) a plan for preventing these areas from going below standard in the future. Nevertheless, Tony Johnson never provided a response to the Inspection Report nor did he provide a prevention plan.

7.     By letter dated December 7, 1998, a copy of which is attached hereto as **Exhibit 3** and incorporated herein by reference, Tony Johnson gave a two-week resignation notice stating that his last day would be December 21, 1998. Despite his notice, Tony Johnson did not remain on the job at Laurens Way through December 21, 1999. Instead, Tony Johnson walked off the job the week of December 14, 1998, leaving Laurens Way unexpectedly without a maintenance superintendent less than two weeks before Christmas, which is a busy time of year in the maintenance of an apartment community.

8.     When a Maintenance Superintendent position becomes available at an apartment

-2-

community managed by D&F, generally the on-site resident manager, the Regional Property Manager, and the Regional Maintenance Coordinator will be involved in the search for, assessment of, and hiring of qualified candidates for the position. D&F's policy and preference is to try to fill the position with someone currently working either at that community or another D&F community. In keeping with that policy and preference, I approved the hiring of Eugene Johnson, who is African-American, to replace Tony Johnson as Superintendent at Laurens Way. Eugene Johnson was transferred and promoted from another D&F-managed apartment community, where he had been a maintenance technician. Steven Hayworth had suggested that I approve Eugene Johnson's transfer and promotion to Laurens Way, which I did.

9. In or about June 1999, Steven Hayworth told me that Tony Johnson wanted to be rehired as a Maintenance Superintendent at a D&F-managed apartment community. Mr. Hayworth asked whether I would consider approving the hiring of Mr. Johnson as a Maintenance Superintendent for one of the apartment communities under my management responsibility, should such an opening arise. I told Mr. Hayworth that I would not be willing to hire Mr. Johnson as a Maintenance Superintendent since I did not feel Mr. Johnson had given enough attention to detail when he supervised the maintenance at Laurens Way, Mr. Johnson had never provided a response to the Inspection Report, and Mr. Johnson had failed to honor his two-week notice of resignation in the middle of the Holiday season.

10. Mr. Johnson's race was not a factor in my decision not to consider approving the hiring of Mr. Johnson as a Maintenance Superintendent.

11. I know the matters stated herein of my own knowledge, except as to those matters stated on information and belief and as to those I believe them to be true. In addition, I am over twenty-one, under no disability, and am competent to testify to the matters stated herein.

Lawrence Berry

Sworn to and subscribed before me this

27 day of February , 20 03.

Keith A. Satisky
NOTARY PUBLIC

My Commission Expires: _____



g:\d&f\johnson\aff-lb.doc

-4-

# The Magic of Lawrence Berry


# *Memorandum*

**To:** Tony Johnson
**From:** Larry & Anne Berry
**cc:** Marilee Hendricks
Jere Buch
Steve Hayworth
**Date:** Wednesday, October 7, 1998
**Subject:** Maintenance Inspection
Laurens Way Apartments

The maintenance inspection performed on October 6, 1998 shows that we have a lot of work to do. There is not anything on the report that can not be rectified, with many items just needing some additional coordination. I realize this was your first inspection, and I have complete confidence that we will see improvement in the near future.

Please review the inspection report, and provide a response on how each of the exceptions were corrected. I would also like you to provide your plan on how we can prevent these areas from going below standard in the future. This report should be provided to me no later than October 30, 1998. Should you need any assistance or have any questions, please feel free to contact Steve Hayworth or myself.

Thank you for your attention to these matters.

D 0001



EXHIBIT
2

# DRUCKER & FALK, LLC
# MAINTENANCE INSPECTION

**PROPERTY:** _Laurens Way_

**SUPERINTENDENT:** _Tony Johnson_

**DATE:**

INSPECTION #1 _10/6/98_

INSPECTION #2 _____

**INSPECTED BY:**

INSPECTION #1 _Steve Hayworth & Larry Berry_

INSPECTION #2 _____

**PURPOSE:**

The purpose of the Drucker & Falk, LLC Maintenance Inspection is to provide a positive means of determining the physical condition of a property, as well as to evaluate the adherence to Drucker & Falk, LLC's policies, procedures, and expectations, so that the Drucker & Falk, LLC managed properties can achieve the highest possible standard.

The Maintenance Inspection promotes safety awareness, evaluates compliance with OSHA Guidelines and is a means of establishing future goals for each property.

The Inspection is used as a means of recognizing those that have achieved above satisfactory results.

**PROCEDURE:**

The Maintenance Inspection is unannounced and is completed at least twice a year by either the Maintenance Director or Assistant Maintenance Director. The Inspection establishes a criteria that is consistent throughout Drucker & Falk, LLC and evaluates the condition of the property "as it is" that day. The reason the inspection is unannounced to the property is that a property should be ready to be seen at all times for a surprise visit from an owner, an owner's representative, inspector, and most importantly, a prospective resident.

The Property Manager may accompany the inspector, but the Manager and Superintendent should accompany the inspector.

Photographs of accomplishments and of areas of concern will be taken in order to illustrate items detailed on the inspection.

# MAINTENANCE INSPECTION REPORT
## SUMMARY

| CATEGORY | MAXI-MUM POINTS | EARNED POINTS #1 | EARNED POINTS #2 | N/A POINTS #1 | N/A POINTS #2 |
|---|---|---|---|---|---|
| GROUNDS/COMMON AREAS | 30 | 23 | | 2 | |
| READY APARTMENTS | 35 | 28 ½ | | 1 | |
| SWIMMING POOL/JACUZZI | 18 | 13 ½ | | | |
| MAINTENANCE MISCELLANEOUS | 9 | 6 ½ | | | |
| SAFETY EQUIPMENT & OSHA REQUIREMENTS | 8 | 4 ½ | | 1 ½ | |
| TOTAL | 100 | 76 | | 4 ½ | |

**SCORING:**

| | | INSPECTION #1 | #2 | AVG. |
|---|---|---|---|---|
| 100 POSSIBLE POINTS | | 100 | 100 | 200 |
| - N/A POINTS | = | 4 ½ | | |
| = MAXIMUM APPLICABLE POINTS FOR THE PROPERTY | = (MAP) | 95 ½ | | |
| EARNED POINTS | | 76 | | |
| MAXIMUM APPLICABLE POINTS FOR THE PROPERTY | ÷ | 95 ½ | | |
| | % | 80 | | |

**GRADING SCALE:**

95 - 100   Outstanding
90 - 94.5   Very Good/Above Average
85 - 89.5   Satisfactory
80 - 84.5   Needs Improvement
70 - 79.5   Needs Immediate Attention

**COMMENTS:**

Inspection #1

Tony needs to have a regular routine for cleaning and checking readies and the clubhouse/office restrooms + pool.

Inspection #2

# MAINTENANCE INSPECTION REPORT

## GROUNDS/COMMON AREAS

| | | MAXI-MUM POINTS | EARNED POINTS #1 | #2 | N/A POINTS #1 | #2 |
|---|---|---|---|---|---|---|
| | **TOTAL POINTS:** | | | | | |
| 1. | The grounds are free of trash, including behind the buildings, in the dumpster areas, and the parking lots. | 2 | 0 | | | |
| 2. | All automobiles are properly licensed and operable; and if not, are tagged with the proper notification. | 1 | 0 | | | |
| 3. | The storm drains on the property are clear of debris so that runoff can drain properly. | 1 | 1 | | | |
| 4. | The exterior lighting is in good condition. | 1 | 1 | | | |
| 5. | The flags and poles are in good condition. | 1/2 | | | 1/2 | |
| 6. | The signage on the property is well maintained. | 1-1/2 | 1 1/2 | | | |
| 7. | The playground is well maintained with: | | | | | |
| | a. paint in good condition. | 1/2 | 1/2 | | | |
| | b. the equipment in good and safe condition. | 1 | 1 | | | |
| | c. no grass growing in the sand areas. | 1/2 | 1/2 | | | |
| 8. | There is no trash (newspapers, children's toys, et cetera) on the roofs. | 1-1/2 | 1 1/2 | | | |
| 9. | There are no tree limbs touching the roofs or eaves. | 1-1/2 | 1 1/2 | | | |
| 10. | The dumpsters are: | | | | | |
| | a. clean. | 1/2 | 1/2 | | | |
| | b. in good condition. | 1/2 | 1/2 | | | |
| 11. | The dumpster enclosures are in good condition. | 1 | 1 | | | |
| 12. | The fencing on the property is well maintained with: | | | | | |
| | a. no loose posts. | 1/2 | 1/2 | | | |
| | b. no missing boards or wire. | 1/2 | 1/2 | | | |
| 13. | There are no holes or missing sewer caps on the property that could cause an accident. | 1 | 0 | | | |
| 14. | Exterior of building in good condition. | 1 | 1 | | | |
| 15. | There are no exterior faucets dripping on the property. | 1 | 1 | | | |

## GROUNDS/COMMON AREAS - Continued

| | | MAXI-MUM POINTS | TOTAL POINTS: EARNED POINTS | | N/A POINTS | |
|---|---|---|---|---|---|---|
| | | | #1 | #2 | #1 | #2 |
| 6. | The gutters are: | | | | | |
| | a. clean. | 1/2 | 1/2 | | | |
| | b. secure. | 1/2 | 1/2 | | | |
| 7. | The downspouts are in good condition and have splash blocks under them where applicable, & in good condition. | 1/2 | 1/2 | | | |
| 8. | The screens are in good condition. | 1 | 1 | | | |
| 9. | There are no screens laying on the ground on the property. | 1 | 1 | | | |
| 20. | Laundry rooms and machines are clean. | 1 | 0 | | | |
| 21. | The clubhouse is clean. | 1 | 1 | | | |
| 22. | The clubhouse is free of maintenance repairs. | 1 | 1 | | | |
| 23. | The hallways/breezeways are clean. | 1 | 1 | | | |
| 24. | Overall appearance of: | | | | | |
| | a. flowers. | 1/2 | 1/2 | | | |
| | b. shrubs. | 1/2 | 1/2 | | | |
| | c. flower beds. | 1/2 | 1/2 | | | |
| 25. | Tennis courts/nets in good condition. | 1/2 | 1/2 | | | |
| 26. | Volley ball courts/nets in good condition. | 1/2 | | | 1/2 | |
| 27. | Weight room in good condition. | 1/2 | | | 1/2 | |
| 28. | Basketball courts/nets in good condition. | 1/2 | | | 1/2 | |
| 29. | Mailbox areas in good condition (lights, trashcans, etc.) | 1 | 1 | | | |
| | **TOTAL GROUNDS/COMMON AREAS** | 30 | 23 | | 2 | |

## COMMENTS:

Inspection #1 The grounds needs a better daily pick-up, Camaro + chrysler w/expired tags, holes need to be filled behind the shop and laundry rooms needs sweeping + trash emptied daily.

## GROUNDS/COMMON AREAS - Continued

Inspection #2

_____

_____

_____

_____

_____

_____

## READY APARTMENTS

Apartment address:

1020 East Canes, 926

| | | MAXI-MUM POINTS | EARNED POINTS | | N/A POINTS | |
|---|---|---|---|---|---|---|
| | | | #1 | #2 | #1 | #2 |
| 1. | The front door to the ready apartment is clean. | 1-1/2 | 1/2 | | | |
| 2. | The identification number/letter is on the front door. | 1/2 | 1/2 | | | |
| 3. | The appliances in the apartment are clean and in working order: | | | | | |
| | a. refrigerator (if the power is off, door must be open) | 1/2 | 0 | | | |
| | b. range/hood | 1/2 | 1/2 | | | |
| | c. disposal | 1/2 | 0 | | | |
| | d. dishwasher | 1/2 | 1/2 | | | |
| | e. washer/dryer | 1/2 | | | 1/2 | |
| | f. microwave | 1/2 | | | 1/2 | |
| 4. | The following items are clean: | | | | | |
| | a. cabinets. | 1/2 | 1/2 | | | |
| | b. countertops | 1/2 | 1/2 | | | |
| | c. sink | 1/2 | 1/2 | | | |
| 5. | All of the lights in the apartment are working properly. | | | | | |
| | a. kitchen | 1/2 | 1/2 | | | |
| | b. hallway | 1/2 | 1/2 | | | |
| | c. bathroom(s) | 1/2 | 1/2 | | | |
| | d. overhead/ceiling fan | 1/2 | 1/2 | | | |
| | e. exterior - front and back | 1/2 | 1/2 | | | |
| 6. | Window frames against wall are neatly painted and window sills cleaned. | 1/2 | 1/2 | | | |
| 7. | Storage rooms cleaned. | 1/2 | 1/2 | | | |

## READY APARTMENTS - Continued

| | | MAXIMUM POINTS | EARNED POINTS #1 | EARNED POINTS #2 | N/A POINTS #1 | N/A POINTS #2 |
|---|---|---|---|---|---|---|
| | **TOTAL POINTS:** | | | | | |
| 8. | The light globes are clean and free of paint: | | | | | |
| | a. kitchen | 1/2 | 0 | | | |
| | b. hallway | 1/2 | 0 | | | |
| | c. bedroom(s) | 1/2 | 1/2 | | | |
| | d. bathroom(s) | 1/2 | 1/2 | | | |
| | e. living room/dining room | 1/2 | 1/2 | | | |
| | f. exterior - front and back | 1/2 | 1/2 | | | |
| 9. | All receptacle and switch plates are clean and free of paint. | 1 | 1 | | | |
| 10. | All door stops are clean and free of paint. | 1 | 1 | | | |
| 11. | All door knobs are clean and free of paint. | 1 | 1 | | --- | |
| 12. | The bathroom(s) is/are clean: | | | | | |
| | a. sink(s) | 1/2 | 1/2 | | | |
| | b. medicine cabinet(s) | 1/2 | 1/2 | | | |
| | c. floor(s) | 1/2 | 1/2 | | | |
| | d. commode(s) | 1/2 | 0 | | | |
| | e. tub(s)/shower(s) | 1/2 | 0 | | | |
| | f. tile | 1/2 | 1/2 | | | |
| | g. countertops | 1/2 | 0 | | | |
| | h. vanity/shelves | 1/2 | 1/2 | | | |
| 13. | All floors are clean and in good condition. | 1 | 1 | | | |
| 14. | The walls in the apartment are clean and/or freshly painted. | 1 | 1 | | | |
| 15. | All locking mechanisms and doors in the apartment are working properly: | | | | | |
| | a. front door | 1 | 1 | | | |
| | b. back door/patio/balcony | 1 | 1 | | | |
| | c. bathroom(s) | 1 | 0 | | | |
| | d. windows | 1 | 1 | | | |
| | e. bedrooms | 1 | 1 | | | |
| 16. | All screens are in good condition. | 1 | 1 | | | |
| 17. | The ready apartment has a fresh, clean smell. | 1 | 1 | | | |
| 18. | Blinds/draperies are in good condition. | 1 | 1 | | | |
| 19. | Blinds/draperies are hung properly. | 1 | 1 | | | |

D 0007

## READY APARTMENTS - Continued

| | | MAXI-MUM POINTS | EARNED POINTS #1 | #2 | N/A POINTS #1 | #2 |
|---|---|---|---|---|---|---|
| 0. | Water heater is turned off. | 2 | 2 | | | |
| 21. | The filter is clean. | 1 | 0 | | | |
| 2. | The smoke detector is operating properly. | 1 | 1 | | | |
| | **TOTAL READY APARTMENTS** | 35 | 28½ | | 1 | |

**COMMENTS:**

Inspection #1  Two ink pens left on top of frig, disposal has debris left inside, clean bugs from light fixtures, commode has loose seat + remove shower caulk; caulk counters in kitchen, tighten bath nob + install a filter.

Inspection #2

## SWIMMING POOL/JACUZZI

TOTAL POINTS: 11-1/2

| | | MAXI-MUM POINTS | EARNED POINTS #1 | #2 | N/A POINTS #1 | #2 |
|---|---|---|---|---|---|---|
| 1. | The gate closure is operable. | 2 | 2 | | | |
| 2. | The furniture is in good condition. | 1 | 1 | | | |
| 3. | The pool fencing is in good condition. | 1 | 1 | | | |
| 4. | The proper signage is clearly displayed (including depth markers. | 1 | 1 | | | |
| 5. | The pool is properly vacuumed. | 1 | 1 | | | |
| 6. | There is no evidence of algae in the pool/jacuzzi. | 1 | 1 | | | |
| 7. | The pool/jacuzzi deck is clean. | 1/2 | 1/2 | | | |
| 8. | The trash cans at the pool/jacuzzi are at least emptied daily. | 1 | 0 | | | |

## SWIMMING POOL/JACUZZI - Continued

| | | MAXI-MUM POINTS | EARNED POINTS #1 | EARNED POINTS #2 | N/A POINTS #1 | N/A POINTS #2 |
|---|---|---|---|---|---|---|
| | **TOTAL POINTS: 11-1/2** | | | | | |
| 9. | The pump room is clean. | 1/2 | 1/2 | | | |
| 10. | The pool equipment is put up properly: | | | | | |
| | a. test kit | 1/2 | 1/2 | | | |
| | b. brushes | 1/2 | 1/2 | | | |
| | c. vacuum hose | 1/2 | 1/2 | | | |
| | d. chemicals on shelves or skids/lids on chemicals | 1/2 | 1/2 | | | |
| | e. safety equipment/shepherds crook, life ring, depth rope. | 1/2 | 1/2 | | | |
| 11. | The record of the pool chemicals is up-to-date with daily chlorine and pH readings and any other required readings. | 1 | 1 | | | |
| 12. | MSDS are on file at the pool. | 1 | 0 | | | |
| 13. | All skimmer baskets are clean, including the sides of the skimmers. | 2 | 0 | | | |
| 14. | The ladies' room is clean and working properly. | 1/2 | 1/2 | | | |
| 15. | The mens' room is clean and working properly. | 1/2 | 0 | | | |
| 16. | Exterior faucets/showers are operating properly. | 1/2 | 1/2 | | | |
| 17. | All ladders and railings are secure and in good condition. | 1 | 1 | | | |
| | **TOTAL SWIMMING POOL /JACUZZI** | 18 | 13 1/2 | | | |

## COMMENTS:

Inspection #1 Empty cans + ash-trays daily, update MSDS file to include calcium chloride, empty skimmers regularly + install cover on both light fixture.

Inspection #2

D 0009

# MAINTENANCE MISCELLANEOUS

| | | MAXI-MUM POINTS | EARNED POINTS #1 | #2 | N/A POINTS #1 | #2 |
|---|---|---|---|---|---|---|
| .. | All work orders are signed by the person completing the work. | 1/2 | 1/2 | | | |
| 2. | All work orders detail the work completed; and if pertinent, the parts used. | 1/2 | 1/2 | | | |
| 3. | The apartment community truck/golf cart is clean. | 1 | 1 | | | |
| 4. | Shop is clean and well-organized. | 1 | 1 | | | |
| 5. | The maintenance equipment is being properly cared for. | 1/2 | 1/2 | | | |
| 6. | The property equipment is etched with the property number. | 1-1/2 | 0 | | | |
| 7. | The property equipment is properly stored. | 1/2 | 1/2 | | | |
| 8. | Maintenance Personnel: | | | | | |
| | a. uniforms are clean. | 1/2 | 1/2 | | | |
| | b. neatly trimmed hair. | 1/2 | 1/2 | | | |
| | c. clean shaven: if sporting a beard, it is trimmed close to the face. | 1/2 | 1/2 | | | |
| | d. I.D badge is being worn properly. | 1/2 | 1/2 | | | |
| 9. | Monthly maintenance sheets are completed and turned in on schedule. | 1/2 | 0 | | | |
| 10. | Purchase Orders completed by the Maintenance Staff are filled out properly. | 1/2 | 0 | | | |
| 11. | Unusable parts and appliances are disposed of on a regular basis; and if not, they are stored safely and properly. | 1/2 | 1/2 | | | |
| | **TOTAL MAINTENANCE MISCELLANEOUS** | 9 | 6½ | | | |

## COMMENTS:

Inspection #1  etch all property equipment with property number, three maintenance sheets have been late this year and fill out PO's completely when ordering

D 0010

# MAINTENANCE MISCELLANEOUS - Continued

spection #2 _____

_____

_____

_____

_____

# AFETY EQUIPMENT & OSHA REQUIREMENTS

|  |  | MAXI-MUM POINTS | EARNED POINTS | | N/A POINTS | |
|---|---|---|---|---|---|---|
|  | TOTAL POINTS: |  | #1 | #2 | #1 | #2 |
| 1. | All hazardous material posters are displayed and filled out completely. | 1/2 | 1/2 |  |  |  |
| 2. | All employee training records are on file. | 1/2 | 1/2 |  |  |  |
| 3. | All ladders on the community are OSHA type I or II. | 1/2 | 1/2 |  |  |  |
| 4. | The community has all protective equipment available for use. | 1/2 | 1/2 |  |  |  |
| 5. | All MSDS for chemicals used by contractors and by the property are: |  |  |  |  |  |
|  | a. on file at the maintenance shop. | 1/2 | 0 |  |  |  |
|  | b. on file for the chemicals in the rental office. | 1/2 | 0 |  |  |  |
|  | c. on file for the chemicals in the model. | 1/2 | 1/2 |  |  |  |
|  | d. on file for chemicals in the clubhouse. | 1/2 | 1/2 |  |  |  |
|  | e. on file for chemicals in the paint room. | 1/2 |  |  | 1/2 |  |
| 6. | A master file of all MSDS are available at the property. | 1/2 | 1/2 |  |  |  |
| 7. | The written hazard communication program is completed and current, on file, and acknowledged by all employees. | 1/2 | 0 |  |  |  |
| 8. | The safety guards are: |  |  |  |  |  |
|  | a. on the grinders. | 1/2 | 1/2 |  |  |  |
|  | b. on the key machines. | 1/2 | 1/2 |  |  |  |
|  | c. on the mowers/weedeaters. | 1/2 |  |  | 1/2 |  |

D 0011

## AFETY EQUIPMENT & OSHA REQUIREMENTS - Continued

| | | MAXI-MUM POINTS | EARNED POINTS | | N/A POINTS | |
|---|---|---|---|---|---|---|
| | | | #1 | #2 | #1 | #2 |
| 9. | Chemicals not in their original containers are identified with a secondary label. | 1/2 | 0 | | | |
| 10. | O & M Manual upkeep is current. | 1/2 | | | 1/2 | |
| | TOTAL SAFETY EQUIPMENT & OSHA REQUIREMENTS | 8 | 4 1/2 | | 1 1/2 | |

**COMMENTS:**

Inspection #1  Update MSDS file for Venture D/W liquid for the shop and for Hot Shot in the office. Also, have all Employees sign the HazCom Program and be sure to use secondary labels.

Inspection #2

**FUTURE IMPROVEMENT NEEDS ON THE PROPERTY:**

Inspection #1  LANDSCAPING IS IN NEED OF CONSIDERABLE IMPROVEMENT. SEEDING AND AERATING IS TO BE PERFORMED IN THE COMING WEEKS. THERE ARE APPROXIMATELY 20 TREES THAT NEED TO BE REMOVED.

Inspection #2

## EQUIPMENT NEEDS ON THE PROPERTY:

Inspection #1 _____

_____

_____

_____

Inspection #2 _____

_____

_____

_____

## CONDITION OF THE EXTERIOR OF THE PROPERTY:
(Please note all areas of concern.)

### Parking lots, curbing, and sidewalks:

Inspection #1

IN GOOD REPAIR _____

_____

_____

Inspection #2

_____

_____

_____

### Roofs (Include any limbs needing trimming):

Inspection #1

MANY TREES SCHEDULED TO BE REMOVED THAT ARE DEAD OR

LEANING.

_____

_____

## Roofs (Include any limbs needing trimming): - Continued

**Inspection #2**

_____
_____
_____
_____

## Wood:

**Inspection #1**

_____Good_____
_____
_____
_____

**Inspection #2**

_____
_____
_____
_____

## Fencing :

**Inspection #1**

_____
_____
_____
_____

**Inspection #2**

_____
_____
_____
_____

## Gutters and downspouts:

**Inspection #1**

_____Good_____
_____
_____
_____

D 0014

Gutters and downspouts: - Continued

Inspection #2

_____
_____
_____
_____

Lakes/Ponds:

Inspection #1

_____N/A_____
_____
_____
_____

Inspection #2

_____
_____
_____
_____

Boiler rooms:

Inspection #1

_____NA_____
_____
_____
_____

Inspection #2

_____
_____
_____
_____

Drainage concerns:

Inspection #1

___SEVERAL AREAS OF REPORTED PONDING OF WATER_____
_____
_____
_____

D 0015

**Drainage concerns: - Continued**

Inspection #2

_____
_____
_____
_____

**Condition of exterior paint/siding:**

Inspection #1

_____Good_____
_____
_____
_____

Inspection #2

_____
_____
_____
_____

**Condition of handrails and steps:**

Inspection #1

_____Good_____
_____
_____
_____

Inspection #2

_____
_____
_____
_____

**Condition of pool furniture:**

Inspection #1

_____FURNITURE IS STAINED AFTER ONLY ONE SEASON.____
_____
_____
_____

Condition of pool furniture: - Continued

Inspection #2

_____
_____
_____
_____

Condition of mail areas:

Inspection #1
_____GOOD_____
_____
_____
_____

Inspection #2

_____
_____
_____
_____

Foundation/crawl spaces:

Inspection #1
_____N/A_____
_____
_____

Inspection #2

_____
_____
_____

Elevator

Inspection #1
_____N/A_____
_____
_____
_____

Elevator - Continued

**Inspection #2**

_____
_____
_____
_____

Lift Stations

**Inspection #1**

_____ N IA _____
_____
_____
_____

**Inspection #2**

_____
_____
_____
_____

Condition of Deck

**Inspection #1**

_____
_____
_____
_____

**Inspection #2**

_____
_____
_____
_____

Landscaping/Retaining Walls

**Inspection #1**

AS STATED IN OPENING COMMENTS.
_____
_____
_____

## Landscaping/Retaining Walls - Continued

**Inspection #2**

_____
_____
_____
_____

## Signage

**Inspection #1**

_____NEED___PAINTING_____
_____
_____
_____

**Inspection #2**

_____
_____
_____
_____

## Phone/Cable Boxes

**Inspection #1**

_____GOOD_____
_____
_____
_____

**Inspection #2**

_____
_____
_____

## Exterior Lighting

**Inspection #1**

_____GOOD_____
_____
_____
_____

**D 0019**

## Exterior Lighting - Continued

**Inspection #2**

_____
_____
_____
_____

## Miscellaneous

**Inspection #1**

_____
_____
_____
_____
_____
_____

**Inspection #2**

_____
_____
_____
_____
_____
_____

C:\FILES\FORMS\MAINTFRM.WK4:CSP:02/18/98

7 DEC. 98

TO: LAURENS WAY APT.

AS OF 7 DEC. 98, I GIVE MY 2 WEEKS NOTICE. MY LAST DAY OF EMPLOYMENT FOR LAURENS WAY WILL BE THE 21st OF DECEMBER.

I DO APPRECIATE DRUCKER + FALK GIVING ME THE OPPORTUNITY TO WORK FOR THIS COMPANY, AND THE STAFF OF LAURENS WAY. ONCE AGAIN, THANK YOU FOR YOUR UNDERSTANDING AND CARING FOR MY FAMILY.

SINCERLY,
TONY E. JOHNSON
MAINTENANCE SUPERINTENDENT

**EXHIBIT**

3

# THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
### CIVIL ACTION NO. 5:02-CV-227-BR(3)

TONY JOHNSON,          )
      Plaintiff,       )
                       )
      Vs.             )      **AFFIDAVIT OF KELLIE FALK-TILLETT**
                       )
DRUCKER & FALK, LLC,    )
      Defendant.     )

The undersigned, Kellie Falk-Tillett, being first duly sworn, deposes and says that:

1.     I am a resident of Wake County, North Carolina.

2.     Between July 1996 and May 1999, I was a Regional Property Manager employed by Drucker & Falk, Inc. As Regional Property Manager, I had responsibility for the overall operations of multiple apartment communities managed by Drucker & Falk, LLC ("D&F"). From July 1996 until September 1998, Laurens Way Apartments ("Laurens Way") in Knightdale, North Carolina was one of the apartment communities under my management responsibility. Since May 1999, I have been Vice-President of Drucker & Falk, Inc.

3.     On October 10, 1997, I received a letter from Denise Cooke, who was then the on-site community manager of Laurens Way, stating that she would be resigning in two weeks. A true and accurate copy of this letter is attached hereto as **Exhibit 1**.

4.     I am one of the custodians of and am familiar with Denise Cooke's employment file. Attached as **Exhibit 2** is true and accurate copy of a Payroll Information & Record for Denise Cooke showing that her last day of work was October 24, 1997. Payroll Information & Records are regularly kept for each employee in the regular course of D&F's business to reflect any changes in an employee's payroll status, and are prepared at or near the time the change takes place. This is consistent with my own personal recollection that Denise Cooke fulfilled her two-week resignation period.

5.     As evidenced by the Payroll Information and Record attached hereto as **Exhibit 3**, effective June 1, 1998, Denise Cooke was hired as the on-site community manager of the Pinnacle

Apartments, in Raleigh, North Carolina, which is also managed by D&F.

6.     In February 1999, Tony Johnson approached me about coming back to work as a Maintenance Superintendent for an apartment community managed by D&F. I knew Mr. Johnson had formerly worked as the Maintenance Superintendent at Laurens Way; I had actually approved Mr. Johnson's promotion to Laurens Way in 1997. However, when he approached me in February 1999, Mr. Johnson did not describe, nor was I aware of, the circumstances of his departure from Laurens Way. Since I was no longer a Regional Property Manager and had no knowledge of open Superintendent positions, I told Mr. Johnson to contact Steven Hayworth, who was then Regional Maintenance Coordinator for North Carolina apartment communities managed by D&F.

7.     In June 1999, I received a copy of a letter from Tony Johnson dated June 17, 1999. I then reviewed Mr. Johnson's employment file for the first time and spoke with Steven Hayworth and Lawrence Berry. I discovered that Mr. Johnson had failed to fulfill his two-week resignation notice period. I then instructed Steven Hayworth to send Mr. Johnson a letter explaining that he would not be considered for rehire as a Maintenance Superintendent because he had failed to finish out the full two weeks of his notice.

8.     I know the matters stated herein of my own knowledge, except as to those matters stated on information and belief and as to those I believe them to be true. In addition, I am over twenty-one, under no disability, and am competent to testify to the matters stated herein.

_Kellie Falk-Tillett_
Kellie Falk-Tillett

Sworn to and subscribed before me this

27th day of February, 2003.

_Brenda P. Milam_
NOTARY PUBLIC
My Commission Expires: 9/27/05

g:\d&f\johnson\affidavit of KFT.doc

BRENDA P. MILAM
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 9-27-2005

-2-



EXHIBIT

____/____

October 10, 1997

Kellie Falk-Tillett
7200 Stonehenge Dr, Ste 211
Raleigh, NC 27613

Dear Kellie,

As of today, October 10, 1997, I am giving my two weeks notice. I have very much enjoyed working for Drucker and Falk. It has been a great opportunity for me and my career, but I feel it is time for me to make a change to better myself.

Thank you for all you have done for me and all the support you have given me.

I wish all the success to Drucker and Falk as they celebrate their 60 Anniversary.

Sincerely,

Denise Cooke, Mgr.
Laurens Way Apts.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER   D 0396

*Denise's final account*



# DRUCKER & FALK

**PAYROLL INFORMATION & RECORD**

PROPERTY SITE *Lauren Way*   DATE COMPLETED 10/24/97

**PURPOSE OF REPORT (CHECK ONE BLOCK)**

☐ PERMANENT TRANSFER BETWEEN SERVICES RENDERED PROPERTIES (COMPLETE 1, 1A, 2, 10)
☐ SET UP NEW EMPLOYEE (COMPLETE ITEMS 1 THROUGH 10)
☐ INFORMATION CHANGE, EXISTING EMPLOYEE (COMPLETE ITEMS 1, 2 AND ITEM TO BE CHANGED)
☒ EMPLOYEE TERMINATION (COMPLETE ITEMS 1, 2 and 11)

1. EMPLOYEE FILE NO. *1900031*   1A. HOME DEPARTMENT *11036*

2. EMPLOYEE NAME *Denise Cooke*
   ADDRESS *120 Serophna Lane*
   CITY *Knightdale*   STATE *NC*   ZIP *27545*

3. SOCIAL SECURITY NO. _____   DATE OF BIRTH _____

4. EFFECTIVE DATE OF (EMPLOYMENT, CHANGE, TRANSFER)...................... _____

5. SALARY INFORMATION: SALARIED (ENTER AMOUNT PER PERIOD)............. $ _____
   OR
   HOURLY, ENTER, HOURLY RATE ...................... $ _____ HR.

6. TAX INFORMATION:   CIRCLE MARRIED (M) OR SINGLE (S)................... **M** OR S
   (W-4 FORMS MUST BE ATTACHED)
   STATE CODE (ABBREVIATE STATE NAME) ............... _____
   STATE EXEMPTIONS (IF APPLICABLE).................. # _____
   FEDERAL EXEMPTIONS ............................ # _____

7. OTHER DEDUCTIONS: DOES EMPLOYEE WANT:
   **(CIRCLE YES OR NO)**
   1. HOSPITAL INSURANCE ................. YES   NO   #1 _____
   2. _____ YES   NO   _____
   3. _____ YES   NO   _____

8. JOB CLASSIFICATION:   ☐ FULL-TIME   OR   ☐ PART-TIME   OR   ☐ TEMPORARY

9. LIFE INSURANCE CODE: (CIRCLE ONE NUMBER) 1 2 3 4 5 6 7   (FULL TIME POSITIONS ONLY)

10. TRANSFER FROM ANOTHER SITE - NAME OF SITE _____
    ACCRUED VACATION BEING TRANSFERRED _____ HRS.   ACCRUED SICK LEAVE _____ HRS.

11. EMPLOYEE TERMINATION - LAST DAY WORKED *10/24/97*
    HOURS OF ACCRUED VACATION PAID ON FINAL PAY *65* HRS.
    REASON FOR TERMINATION *rent*

_____

_____
SIGNATURE OF EMPLOYEE

*Carleen Giles*
SIGNATURE OF SUPERVISOR

**NOTE: IF THE EMPLOYEE WAS TRANSFERRED FROM ANOTHER SITE, ITEM 11 ABOVE MUST ALSO BE COMPLETED**

**EXHIBIT 2**

FORM NO. 6 11/93 5M

**OFFICE FILE**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER   D 0387



# DRUCKER & FALK

## PAYROLL INFORMATION & RECORD

PROPERTY SITE _Pinnacle Apts_  DATE COMPLETED _6 10 98_

**PURPOSE OF REPORT (CHECK ONE BLOCK)**

- [ ] PERMANENT TRANSFER BETWEEN SERVICES RENDERED PROPERTIES (COMPLETE 1, 1A, 2, 10)
- [✓] SET UP NEW EMPLOYEE (COMPLETE ITEMS 1 THROUGH 10)
- [ ] INFORMATION CHANGE, EXISTING EMPLOYEE (COMPLETE ITEMS 1, 2 AND ITEM TO BE CHANGED)
- [ ] EMPLOYEE TERMINATION (COMPLETE ITEMS 1, 2 and 11)

1. **EMPLOYEE FILE NO.** _174314_     **1A. HOME DEPARTMENT** _100050_

2. **EMPLOYEE NAME** _S. Denise Cooke_
   **ADDRESS** _6511-523 Pebble Arbor Circle_
   **CITY** _Raleigh_   **STATE** _NC_   **ZIP** _27609_

3. **SOCIAL SECURITY NO.** _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_   **DATE OF BIRTH** _8-18-61_

4. **EFFECTIVE DATE OF** (EMPLOYMENT, CHANGE, TRANSFER)..................... _6-1-98_

5. **SALARY INFORMATION:** SALARIED (ENTER AMOUNT PER PERIOD)............. $ _942.30_
   OR
   HOURLY, ENTER, HOURLY RATE ..................... $ _____ /HR.

6. **TAX INFORMATION:** (W - 4 FORMS MUST BE ATTACHED)
   CIRCLE MARRIED (M) OR SINGLE (S).................. M OR (S)
   STATE CODE (ABBREVIATE STATE NAME) ............... _NC_
   STATE EXEMPTIONS (IF APPLICABLE) .................. # _0_
   FEDERAL EXEMPTIONS ............................... # _0_

7. **OTHER DEDUCTIONS: DOES EMPLOYEE WANT:**
   (CIRCLE YES OR NO)
   1. HOSPITAL INSURANCE ................. (YES)   NO   #1 _____
   2. _____   YES   NO   _____
   3. _____   YES   NO   _____

8. **JOB CLASSIFICATION:** [✓] FULL - TIME   OR   [ ] PART - TIME   OR   [ ] TEMPORARY

9. **LIFE INSURANCE CODE:** (CIRCLE ONE NUMBER) (1) 2 3 4 5 6 7   (FULL TIME POSITIONS ONLY)

10. **TRANSFER FROM ANOTHER SITE - NAME OF SITE** _____
    ACCRUED VACATION BEING TRANSFERRED_____ HRS.   ACCRUED SICK LEAVE_____ HRS.

11. **EMPLOYEE TERMINATION - LAST DAY WORKED** _____
    HOURS OF ACCRUED VACATION PAID ON FINAL PAY _____ HRS.
    REASON FOR TERMINATION _____

_Denise Cooke_   _Gret North_
SIGNATURE OF EMPLOYEE              SIGNATURE OF SUPERVISOR

**NOTE:** IF THE EMPLOYEE WAS TRANSFERRED FROM ANOTHER SITE, ITEM 11 ABOVE MUST ALSO BE COMPLETED.

**EXHIBIT 3**

FORM NO. 6 11/93 5M      **OFFICE FILE**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO. 5:02-CV-227-BR(3)

TONY JOHNSON,                          )
      Plaintiff,                   )
                                   )
     Vs.                            )          **AFFIDAVIT OF HOWARD WADDILL**
                                   )
DRUCKER & FALK, LLC,                   )
      Defendant.                   )

The undersigned, Howard Waddill, being first duly sworn, deposes and says that:

1.    Between April 1989 and September 2000, I was Maintenance Superintendent at Stonehenge Apartments in Raleigh, North Carolina, which is an apartment community managed by Drucker & Falk, LLC. Since September 2000, I have been a Regional Maintenance Supervisor for Drucker & Falk.

2.    Michael Hudda formerly worked as a maintenance assistant at Stonehenge Apartments. I was Mr. Hudda's supervisor at Stonehenge Apartments and am familiar with his employment record. In the Spring of 1998, Mr. Hudda gave two weeks notice that he was resigning from Stonehenge and moving back to his home State of New York. Mr. Hudda was an excellent employee, he fulfilled his two-week notice period, and he left on good terms.

3.    Lee Anthony (Tony) Baine was hired as a maintenance assistant at Stonehenge Apartments in August 1997, while I was the Maintenance Superintendent. I participated in the decision to hire him.

4.    I know the matters stated herein of my own knowledge, except as to those matters stated on information and belief and as to those I believe them to be true. In addition, I am over twenty-one, under no disability, and am competent to testify to the matters stated herein.



Howard Waddill

Sworn to and subscribed before me this

27th day of February, 2003.

Brenda P Milam
NOTARY PUBLIC

My Commission Expires: 9/27/05

BRENDA P. MILAM
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 9-27-2005

g:\d&f\johnson\affidavit of hw.doc

-2-

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO. 5:02-CV-227-BR(3)

TONY JOHNSON,               )
      Plaintiff,          )
                          )
      Vs.                 )          **AFFIDAVIT OF GERALD WELCH**
                          )
DRUCKER & FALK, LLC,        )
      Defendant.          )

The undersigned, Gerald Welch, being first duly sworn, deposes and says that:

1.     Between 1982 and 1987, I was Maintenance Superintendent at Hunting Ridge Apartments in Raleigh, North Carolina, which is an apartment community managed by Drucker & Falk, LLC. I am currently the Maintenance Superintendent at Meredith Village Apartments located in Raleigh, North Carolina and which are also managed by Drucker & Falk, LLC.

2.     Lee Anthony (Tony) Baine formerly worked as a maintenance technician at Hunting Ridge Apartments during 1986 and 1987. I participated in the decision to hire Mr. Baine, and was his supervisor at Hunting Ridge Apartments the entire time that he was employed at that apartment community. In 1987, Mr. Baine gave Hunting Ridge Apartments two weeks notice that he was resigning. Mr. Baine was a good employee, he fulfilled his two-week notice period, and he left on good terms. The reason I remember the circumstances of his resignation is that he told me he was engaged to a woman whose father owned a well-known car wash in Raleigh, and he planned to go work for his new father-in-law. I continued to keep in touch with Mr. Baine for several years after he left Hunting Ridge Apartments.

3.     I know the matters stated herein of my own knowledge, except as to those matters stated on information and belief and as to those I believe them to be true. In addition, I am over twenty-one, under no disability, and am competent to testify to the matters stated herein.



Gerald Welch

Sworn to and subscribed before me this

27th day of February, 2003.

NOTARY PUBLIC

My Commission Expires: 9/27/05

BRENDA P MILAM
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 9-27-2005

g:\d&f\johnson\affidavit of gw.doc

-2-

```
 1   Q:   And is that when you started working for
 2        Drucker & Falk?
 3   A:   Not immediately.  My first day of employment
 4        was August 7th, 1995.
 5   Q:   Okay.  Did you -- did you do any work
 6        between July of 1995 and August of 1995 in
 7        Raleigh?
 8   A:   I searched.
 9   Q:   You were searching for employment?
10   A:   I was searching for employment.
11   Q:   And so in August of 1995 you began working
12        where, at -- at Stonehenge Apartments?
13   A:   Yes, it was.
14   Q:   How did you find out about a position at
15        Stonehenge Apartments?
16   A:   Newspaper.
17   Q:   The position was advertised in the newspaper?
18   A:   Yes, sir.
19   Q:   What was the position that was advertised?
20   A:   I think it was just maintenance position is
21        how they put it.
22   Q:   Was it a maintenance technician position?
23   A:   I'm not sure of that.
24   Q:   You were hired as a maintenance technician at
```

1 Q: You allege in your Complaint that your
2 relationship with Drucker & Falk began to
3 deteriorate after Larry Berry took over as
4 the regional property manager at Lauren's
5 Way, is that right?
6 A: Yes, sir.
7 Q: Could you explain how your relationship with
8 Drucker & Falk deteriorated?
9 A: Well, by him coming up to the -- coming to
10 the property, there were certain things that
11 were going -- he would make comments and
12 verbal issues about the property; for
13 instance, just trash pickup, better
14 appearance of the bathrooms and stuff like
15 that as a -- there was times and gaps at
16 that community where I was by myself and
17 things were a little difficult, and I
18 probably couldn't handle 280 units by myself.
19 So some of the issues that was brought up I
20 thought weren't -- were unfair.
21 Q: Mr. Berry took over as regional manager in
22 September of 1998, is that right?
23 A: That's correct.
24 Q: And at the time that he took over as

1      regional manager for Lauren's Way, Fred Stone

2      was still working as a technician there, is

3      that right?

4   A: That's correct.

5   Q: In -- in September of 1998 how many times a

6      week, on average, did Larry Berry visit

7      Lauren's Way?

8   A: It seemed to me that he was there often.  I

9      know that he had some appointments on

10     Tuesdays at the community.

11  Q: And was -- was Mr. Berry at Lauren's Way

12     every day?

13  A: I don't believe he was there every day.

14  Q: Was he there at least once a week?

15  A: Yes, sir.

16  Q: At least twice a week?

17  A: Like I said, he -- he was there -- to me, it

18     seemed like he was there quite a few days a

19     week.

20  Q: And you said that Mr. Berry made comments

21     about the apartment.  How -- how often in

22     September did Mr. Berry make comments about

23     the upkeep of the property?

24  A: The times he were there, he would make

1          comments about the bathroom not being clean

2          and --

3   Q:   Which bathroom?

4   A:   The clubhouse bathroom. There was a time

5          where he asked me to come in and take care

6          of the bathroom because it was clogged up

7          one -- one afternoon. And being -- being

8          the maintenance supervisor, there's other

9          things that I could be doing with the

10         apartment community and overseeing.

11   Q:   Isn't cleanliness and upkeep part of the

12         responsibilities of the maintenance

13         supervisor?

14   A:   Yes, it is.

15   Q:   So why was it improper for Mr. Berry to

16         mention to you if the bathrooms were not

17         clean?

18   A:   At 2:00 in the afternoon, as I said, or 3:00

19         in the afternoon, when I'm involved with

20         other things at the community, whether it's

21         involved with vendors or whatnot, to pull me

22         from something as important as trying to

23         make sure the community and structure of the

24         property is -- is fine, a toilet issue I

```
 1            think is totally unfair.
 2    Q:      Well, did -- did Mr. Berry also mention --
 3            did Mr. Berry have any discussions with Fred
 4            Stone during any of the -- his -- during any
 5            of Mr. Berry's visits to the property?
 6    A:      I'm sure they talked, yes.
 7    Q:      Well, how -- how many times in -- are you
 8            saying that every time Mr. Berry visited the
 9            property he would mention something about the
10            upkeep of the property to you?
11    A:      Yes, sir.
12    Q:      So he would mention that the bathrooms were
13            not clean.  Is that -- is that one of the
14            comments that he made to you?
15    A:      Yeah.  He -- because, you know, he would
16            come to the clubhouse.  That would be one of
17            the first places he would visit at the
18            community.
19    Q:      The clubhouse is -- the clubhouse houses the
20            management office -- does the clubhouse house
21            the management office?
22    A:      Yes, it does.
23    Q:      What else is contained within the clubhouse at
24            Lauren's Way?
```

```
1    A:   The washer/dryer area.
2    Q:   Are there any recreation areas for the
3         residents there also?
4    A:   No, just the pool outside.
5    Q:   The pool outside of the clubhouse?
6    A:   Right.
7    Q:   So inside the clubhouse is the management
8         office and the washer and dryer area?
9    A:   That's correct.
10   Q:   Is that all?
11   A:   And the clubhouse itself --
12   Q:   The clubhouse itself?
13   A:   -- which has furniture where you could soit
14        down and a kitchen.
15   Q:   It's like a community area for the residents?
16   A:   The only thing about that is they weren't
17        allowed to have parties and stuff, but to
18        socialize.
19   Q:   But the residents were allowed to socialize
20        in the clubhouse?
21   A:   Whenever there was a function, yes, sir.
22   Q:   Which bathrooms in the clubhouse did Mr.
23        Berry mention to you were not clean?
24   A:   The men's room.
```

```
 1   Q:   How many bathrooms were in the clubhouse?  I
 2        mean, how many -- yeah.  How many bathrooms
 3        were in the clubhouse?
 4   A:   Two, ladies' and men's room.
 5   Q:   One men's room and one ladies' room?
 6   A:   Yes.
 7   Q:   So there was only one men's room and -- one
 8        men's room in the whole clubhouse building?
 9   A:   Yes, sir.
10   Q:   And one ladies' room in the whole clubhouse
11        building?
12   A:   Right.
13   Q:   What did you say to Mr. Berry after he told
14        you that the bathrooms were not clean?
15   A:   I went in and took care of it.
16   Q:   Did -- did Mr. Berry mention any other
17        upkeep problems with the community when he
18        -- when he would visit?
19   A:   The washer/dryer area.
20   Q:   What did he say about the washer and dryer
21        area?
22   A:   The cleanliness of it.  The washer/dryer
23        area is used 24 hours a day.  What we do
24        when we start our day is we take care of the
```

1    whole clubhouse area, the washer/dryer area

2    and the -- and the grounds area.

3         What happens after we are done with

4    that -- like I said, it's used 24 hours a

5    day; and if you come and you inspect at 2:00

6    or 3:00 in the afternoon and expect those

7    items to be 100 percent done, to me, that --

8    that doesn't seem to -- that it's going to

9    be that way except for to say that, "Well,

10   this is wrong, why don't you go ahead and

11   take care of it," and that's what I do.

12   Q:  Is Lauren's Way a nice property?

13   A:  To me, it was.

14   Q:  Is it -- would it be considered more of an

15       upscale property than some of the other

16       Drucker & Falk managed communities?

17   A:  I wouldn't say it was a Class A community.

18   Q:  How many units were available for residents

19       at the time that Mr. Berry took over?  Did

20       you mention 280?

21   A:  I'm sorry.  It was actually 240.

22   Q:  Two hundred and forty units?

23   A:  I'll make a correction on that, 240.

24   Q:  So your normal procedure was to clean the

1    clubhouse at the beginning of each day, is

2    that correct?

3 A: Yes, between me and the assistant our job was

4    to make sure that the clubhouse, the trash

5    and everything was emptied and the grounds

6    was picked up, meaning pick up trash.

7 Q: And did you have a routine for recleaning the

8    clubhouse during the -- at some point during

9    the day?

10 A: No.

11 Q: So -- so your management plan was just to

12    clean the clubhouse in the mornings?

13 A: That's what we did on -- on a daily basis.

14 Q: But when Mr. Berry would come to the

15    clubhouse in the afternoon and notice that

16    the washer and dryer area and the bathroom

17    area were not clean, he would then have y'all

18    tidy up those areas during the afternoon?

19 A: That's correct, whether it was myself or --

20    or Fred Stone.  It could have been myself

21    because Fred might have been turning

22    apartments.  Could have been Fred because I

23    was involved with some vendors or whatnot.

24 Q: What would Mr. Berry complain about the

```
 1           washer and dryer area?
 2    A:     Trash, you know; lint, you know.  Specifics
 3           were that it was dirty.
 4    Q:     Just the washers and dryers themselves were
 5           dirty or the area around the washer and
 6           dryer were dirty?
 7    A:     The -- the washer/dryer area.
 8    Q:     The whole area was dirty?
 9    A:     Yes, sir.
10    Q:     Did you agree that they were dirty?
11    A:     I don't think there was an agreement.  I
12           think I went to take care of the matter.
13    Q:     What would you do to clean up the washer and
14           dryer area?
15    A:     Well, there could have been different things
16           wrong at the time.  Whatever was wrong at
17           the time, that's what I took care of.
18    Q:     What were some of the things that Mr. Berry
19           noticed that he considered to be wrong with
20           the washer and dryer area?
21    A:     Well, what I did is wipe down the dryers and
22           swept the floor from lint.  Like I said, it
23           could have been different things:  trash
24           filled up -- well, the containers, empty
```

```
 1              containers, detergents; stuff like that.

 2   Q:    How about the bathrooms in the clubhouse,

 3              what would Mr. Berry find wrong with the

 4              bathroom?

 5   A:    I remember a situation -- a specific

 6              situation that he called me in because a

 7              toilet was clogged.

 8   Q:    The men's toilet was clogged?

 9   A:    Yes.

10   Q:    Had it been overflowing?

11   A:    It wasn't overflowing.

12   Q:    It was just clogged?

13   A:    Yes.

14   Q:    Did he ever mention any -- mention trash

15              being in the bathroom?

16   A:    Not that I remember.

17   Q:    Did he mention that the bathrooms were

18              dirty?  I believe you mentioned that he

19              complained about the bathrooms being dirty.

20   A:    There was different things wrong at any

21              given time.  I -- specific things, I can't

22              remember.

23   Q:    But when he would mention them to you, you

24              would -- you would clean -- you would take
```

1    care of the issues?

2  A:  Yes.  Like I said, I remember the one issue

3      of going -- he called me in to flush the

4      toilet because it was full up.  It was

5      clogged.

6  Q:  What was your procedure for stocking the

7      clubhouse -- stocking supplies in the

8      clubhouse?

9  A:  I'd order as needed, fill out a purchase

10     order form and order from a supply company.

11 Q:  Didn't Mr. Berry mention to you at times

12     that certain supplies were out of stock in

13     the clubhouse?

14 A:  Yes, he did.

15 Q:  Do you recall when he -- when he mentioned

16     this to you?

17 A:  Well, my opinion is we were always stocked.

18 Q:  And when did he mention to you that you were

19     out of stock?  On which occasions did he

20     mention to you that supplies were out of

21     stock?

22 A:  I -- I remember him saying those things.  It

23     was during that time that he was there at

24     the site.  Specific days or times I can't --

1       can't say.

2   Q:  What did he mention to you was out of stock?

3   A:  I don't remember that either. It was just

4       supplies, meaning, to me, that's a general

5       statement to say supplies.

6   Q:  What else did Mr. Berry mention to you with

7       regard to the upkeep of the property other

8       than the bathrooms and washer and dryer area

9       of the clubhouse?

10  A:  Ultimately, based on his observations, he

11      suggested that Steve Hayworth would come out

12      and do a annual inspection.

13  Q:  No, but I'm talking about specifics. Other

14      than the bathrooms in the clubhouse and the

15      washer and dryer area of the clubhouse, what

16      other specific areas of the property did Mr.

17      Berry mention to you was in need of better

18      upkeep?

19  A:  I think -- I think I mentioned the grounds

20      as well.

21  Q:  The grounds around the property?

22  A:  Right.

23  Q:  What did -- what did Mr. Berry mention about

24      the grounds?

| | | |
|---|---|---|
| 1 | A: | Trash.  I mean, you're going to have little |
| 2 | | papers blow around the community; and, you |
| 3 | | know, we make a clean sweep through the |
| 4 | | community in the mornings.  And when he |
| 5 | | shows up, you see trash, you see paper; you |
| 6 | | assume the overall community is -- is full of |
| 7 | | trash. |
| 8 | Q: | So Mr. Berry at times would come onto the |
| 9 | | community and see trash on the grounds of |
| 10 | | the community? |
| 11 | A: | Yes, sir. |
| 12 | Q: | And what -- what would he say -- what would |
| 13 | | he say to you when he would see trash on the |
| 14 | | grounds?  I mean, did he just tell you to |
| 15 | | pick up -- or take care of picking up the |
| 16 | | trash? |
| 17 | | **MR. HUTSON:**  Objection. |
| 18 | A: | Pretty much. |
| 19 | Q: | You -- you can -- well, what did Mr. Berry |
| 20 | | say to you with regard -- when he would |
| 21 | | notice trash on the grounds? |
| 22 | A: | Trash on the grounds.  I mean, specific |
| 23 | | wording, other than the fact that he noticed |
| 24 | | trash on the grounds. |

1  Q:  Did you have any kind of procedure to check
2      the condition of the grounds during the day?
3  A:  Yes.  It's -- it's everybody's duty to pick
4      up trash as they see it.
5  Q:  Was trash on the grounds the only areas that
6      Mr. Berry mentioned with regard to the
7      grounds?
8  A:  Yes.
9  Q:  Did Mr. Berry make these observations to you
10     throughout the time that you -- throughout
11     the time that you were working at Lauren's
12     Way and he was the regional manager at
13     Lauren's Way?
14 A:  Yes, sir.
15 Q:  Did anybody other than Mr. Berry make any
16     comments to you about the condition of the
17     property at Lauren's Way?
18 A:  Never had a problem.
19 Q:  But my question, did anybody other than
20     Larry Berry mention to you -- mention
21     anything about the upkeep of the property to
22     you?
23 A:  No.
24 Q:  Did Steve Hayworth ever mention anything to

1    this.  I want to -- let me -- I want to go

2    over with you your employment following your

3    working at Lauren's Way Apartments.

4         You worked at Laurel Springs Apartment

5    from December 21st of 1998 to June the 1st

6    of 1999, is that correct?

7  A:  What page is that?

8  Q:  Well, I'm just -- do you -- do you recall --

9    do you recall where you work after you worked

10   at Lauren's Way?

11 A:  Yes.  I went to work at Laurel Springs

12   Apartments.

13 Q:  Where is Laurel Springs Apartments?

14 A:  It's in Raleigh.

15 Q:  Who manages Laurel Springs Apartments?

16 A:  At the time, it was Post Properties.

17 Q:  Post Properties?

18 A:  Yes.

19 Q:  And did you start working at Laurel Springs

20   Apartments on December 21st, 1998?

21 A:  Yes, I did.

22 Q:  And you worked at Laurel Springs Apartments

23   until June 1st of 1999, is that right?

24 A:  That's correct.

1    apartments were viewed during the inspection?

2 A: Right, within those buildings.

3 Q: And then you were evaluated or -- or you were

4    evaluated based on the condition of these

5    ready apartments?

6 A: Yes.

7 Q: And if you look to page D8 -- Bates stamped

8    page D8, looks like you earned 28 and a half

9    points out of a possible 35, is that correct?

10 A: Yes, that's correct.

11 Q: Do you disagree with the ranking that you

12    received for these ready apartments?

13 A: Yes, I do.

14 Q: What part do you disagree with?

15 A: I agree [sic] with the overall rating.  I

16    think the rating should have been higher --

17    should have been higher than 28 and a half.

18 Q: You felt the -- well, let's see.  If you

19    look above the score, you could get one

20    point for the filter being clean.  Are you

21    denying that the filter was dirty?

22 A: No, I'm not.

23 Q: So you agree that the filter was unclean in

24    that instance?

```
 1   A:   Yes.

 2   Q:   All right.  If you look above, on D7, it

 3        says on number 15, "All locking mechanisms

 4        and doors in the apartment are working

 5        properly," and (c) says "bathroom," and there

 6        was zero points given for a possible one.

 7             Do you disagree with that score or do

 8        you agree that you did not deserve a one

 9        point for the bathroom locking mechanism

10        being -- working properly?

11   A:   To be honest with you, I really don't know

12        how to answer that question because it's not

13        even giving an apartment number.  It's just

14        giving building numbers and not necessarily

15        the apartment we actually went in.  So I

16        can't determine that that's actually what was

17        wrong.

18   Q:   Well, why don't you just go through the --

19        the ready apartment section of this

20        inspection report and tell me in which

21        instance where you received zero points that

22        you thought was unjustified.

23   A:   Number three.

24   Q:   Which number three?  Which part on --
```

```
 1   A:   I'm sorry, I should be -- I'm on D6.

 2   Q:   Okay.

 3   A:   I got zero points for the refrigerator.

 4   Q:   And you're claiming that the refrigerator --

 5   A:   The grading --

 6   Q:   -- was spotless?

 7   A:   This -- the grading on this is whether or not

 8        the refrigerator -- the power was off or the

 9        door must be open.  As far as cleanliness, I

10        believe the refrigerator was clean.

11   Q:   So the door must have --

12   A:   So to say --

13   Q:   -- the door must have been closed?

14   A:   The door was probably closed.  All the -- all

15        the appliance doors are closed.

16   Q:   How about (c), the disposal?

17   A:   Disposal may have had some debris in it from

18        -- from construction.

19   Q:   All right.  How about on -- how about on the

20        next page, D7, number (a) at the top?

21   A:   Globes free of paint and kitchen globe could

22        have had some paint on it.  Okay.

23   Q:   How about in the hallway?

24   A:   Hallway, yes.
```

```
1    Q:   Yes what?

2    A:   Yes, it could have had some paint on it.

3    Q:   How about in number 12?

4    A:   Looks like commode zero and tub zero.  Maybe

5         I would disagree with the commode and -- I

6         mean, agree with the commode and not

7         necessarily the tub.  I don't know what was

8         wrong -- what they're saying was wrong there.

9    Q:   What about the countertops?  This is 12(g) in

10        Bates stamp D7.

11   A:   There's nothing saying what's wrong there.

12   Q:   Is it possible that the countertops just

13        weren't clean?

14   A:   It's not -- to me, it's not possible.

15   Q:   Why isn't it possible?

16   A:   Because the apartment was ready for move-in.

17        All the bathrooms, it doesn't say anything

18        that was wrong there.

19   Q:   Well, it says the locking mechanisms and

20        doors are working properly.  And as far as

21        the bathroom goes, you received zero points.

22        Doesn't that mean that the -- the locking

23        mechanisms on the bathroom door were not

24        working properly at the time?
```

1   A:  I really can't determine that --

2   Q:  You mean --

3   A:  -- because it doesn't specifically say it.

4   Q:  Do you remember one way or the other?

5   A:  No, I don't.

6   Q:  All right.  What about the comments on page

7       D8?  Can you read those comments?

8   A:  Two pens on top of the refrigerator.

9       Disposal debris left inside.  Clean bugs from

10      light fixture.  Commode has loose seat and

11      remove shower curtain.  Caulk counters in

12      the kitchen.  Tighten bath -- I'm not sure

13      what that is.

14  Q:  Could it be bath knob?

15  A:  Tighten bath knob and install a filter.

16  Q:  Aren't those comments correct?

17  A:  (No Response)

18  Q:  Were there two ink pens left on top of the

19      refrigerator?

20  A:  Oh, I wouldn't -- I don't know that.

21  Q:  You don't know?  You testified earlier that

22      there were two pens on top of the

23      refrigerator.

24  A:  I said that's what he said, that there was

```
 1           two ink pens on top of the refrigerator.
 2    Q:    So -- so your -- your claim is that there
 3           were not?
 4    A:    (No Response)
 5    Q:    Are you claiming there were -- that there
 6           were not two ink pens left on top of a
 7           refrigerator and that was just made up?
 8    A:    No, I'm not saying that.  I'm saying I
 9           didn't see the two pens on top of the
10           refrigerator, but he did.  I'm not even tall
11           enough to look up on top of the refrigerator.
12    Q:    Well, didn't the disposal have debris left
13           inside of it?  .
14    A:    Yeah, that's possible.
15    Q:    Well, weren't there bugs in the light
16           fixtures?
17    A:    That could be possible, too.
18    Q:    And didn't the commode have a loose seat?
19    A:    That I don't remember.
20    Q:    Didn't the kitchen need caulking?  Didn't
21           the counters in the kitchen need caulking?
22    A:    I can't remember that either.
23    Q:    Well, didn't the bath knob need tightening?
24    A:    I don't remember that either.  But I do --
```

```
1   Q:   But you do remember that it needed a filter?

2   A:   -- remember the filter.  Yes.

3   Q:   Well, look through the rest of this

4        inspection report, if you will, and tell me

5        if there's anything else you disagree with.

6   A:   He gave me a zero --

7   Q:   You can -- you can start from the beginning

8        if --

9   A:   I'm sorry.

10  Q:   Well, I mean, you can start wherever you want

11       to.

12  A:   The -- the swimming pool/jacuzzi section, he

13       gave me zero.

14  Q:   Where are you looking?  What page is this?

15  A:   I'm sorry.  That's D8.

16  Q:   D8, okay.  At the bottom of D8?

17  A:   Yes.  The time of year of October, pretty

18       much you don't have as many swimmers or

19       bathers.  I mean, what could he have

20       possibly found at the pool where he says

21       trash, empty trash and there's not really no

22       activity going on.  And I don't even

23       remember that to be anyway.

24  Q:   You don't remember whether there was any
```

1    trash in the trash cans at the pool/jacuzzi?

2  A:  Not that time of the year.

3  Q:  Are you saying that there weren't any --

4    there was not any trash in the pool or you

5    just don't remember?

6  A:  Yes.  I don't remember it to be trash in the

7    pool at the time of the year because -- just

8    the reason why I say that is you don't have

9    no bathers that time of the year.  So I

10    would wonder where the trash would be --

11    would have accumulated up from.

12  Q:  Well, had you emptied the trash cans that day?

13  A:  That particular day?

14  Q:  Yes, that particular day.

15  A:  I mean, the only pool maintenance that's

16    required of that year is we do do year-round

17    pool maintenance and making sure that the

18    pool looks good and all that and trash is

19    emptied.

20    On this particular day I can't say I

21    actually emptied the trash.  I'm just saying

22    that I don't believe there was that much

23    activity going on at the pool in October.

24  Q:  Well, that's not what it says.  This thing

1       simply says the trash cans at the

2       pool/jacuzzi are at least emptied daily.

3            I'm asking you, at that time were you

4       emptying the trash cans at the pool and

5       jacuzzi on a daily basis?

6    A:  No, I -- I have a schedule where I do my pool

7       maintenance on Monday, Wednesdays and Fridays.

8    Q:  Okay.

9    A:  So that's when I did that stuff.

10   Q:  Is there anything else in this inspection

11      report that you disagree with?

12   A:  He gave me a total zero for MSDS file.

13   Q:  What is MSDS?

14   A:  It's material safety data sheets.  We're

15      required to make sure that for any products

16      that you have that contains cautions,

17      warnings, you must have a sheet for that.

18           Well, to give me a zero, that means to

19      say I didn't have any and which I had a log

20      established.  And there were some products

21      where I did not have MSDS sheets for.  I

22      realize that.

23   Q:  You're looking at number 12 on Bates stamped

24      page D9?

```
 1   A:   Yes.

 2   Q:   So that there were some MSDS that were not

 3        -- that were not on file at the pool, is

 4        that correct?

 5   A:   Yes.  I mean, he could have gave me a half a

 6        point for that.  To just give me a zero is

 7        saying I didn't have any.

 8   Q:   So you're claiming you had some MSDS on file

 9        at the pool?

10   A:   I know I did.

11   Q:   But --

12   A:   I had a -- I had a log.

13   Q:   But not all of the ones you were supposed to

14        have?

15   A:   Right.

16   Q:   Well, how about number 13, all skimmer

17        baskets are clean, including the sides of

18        the skimmers?

19   A:   I just talked about that.  I do pool

20        maintenance on Monday, Wednesdays and

21        Fridays.  I don't know what day this was.

22   Q:   But on the day that this inspection took

23        place, the skimmer baskets were unclean, is

24        that correct?
```

```
 1   A:   They may have had some debris in them.  They

 2        get debris in them.  They weren't full to the

 3        top where I let -- let it go by without

 4        doing it.  I'm not saying there wasn't a

 5        leaf here or there in the -- in the baskets.

 6   Q:   Well, what about number 15, the men's room?

 7   A:   I'm sorry, sir.  He gave me a zero out of a

 8        possible two.

 9   Q:   On what, on number 13?

10   A:   Skimmers.

11   Q:   Yeah.  Well, you just admitted the skimmer

12        baskets weren't clean --

13   A:   Yes.

14   Q:   -- didn't you?

15   A:   Yes, I did.

16   Q:   What about number 15?

17   A:   And we already went over that.

18   Q:   So you agree that the men's room was not

19        clean and working properly?

20   A:   No, I -- no, I disagree with that.

21   Q:   You disagree?

22   A:   Yes.

23   Q:   You claim that the men's room was perfectly

24        clean and working properly at the time?
```

1        when I first started in the company, but I

2        -- I recognize what this is.

3   Q:   What is that?

4   A:   That's the duties and responsibilities of the

5        superintendent.

6   Q:   Are there any duties and responsibilities

7        listed on Exhibit No. 6 that you don't recall

8        being part of the duties listed when you

9        worked at Lauren's Way?  Did that question

10       make any sense?

11  A:   Yes, I understand.

12            MR. HUTSON:  And I'm going to

13            voice an objection to this document at

14            all.  It's dated 10/4/2002.  I don't

15            even see it's relevant.

16            MR. SATISKY:  That's fine.

17  Q:   (By Mr. Satisky) You can still answer.

18  A:   I'm sorry.  Could you repeat that question?

19  Q:   Well, let me ask it further -- in a

20       different way.  Do you see number seven --

21       number seven on this Exhibit No. 6?

22  A:   Yes.

23  Q:   Would you agree that one of the duties of the

24       maintenance superintendent is to continually

CAPITAL REPORTING, INC.

```
1        inspect buildings, grounds and common areas
2        to identify new preventive maintenance --
3        maintenance to ensure that the buildings and
4        common areas are clean and that the grounds
5        are being properly maintained and to identify
6        current and potential safety hazards?
7    A:  Yes, I agree 100 percent, and I did that on
8        a daily basis.
9    Q:  After the maintenance inspection that took
10       place on October 6th of 1998, how often did
11       you and Larry Berry have contact with one
12       another?
13   A:  I'd say we had contact, I mean, because
14       there was an incidence where there was a
15       fire in the community and I guess it was --
16       was panic, kind of hectic, kind of way.  We
17       were both involved -- involved with that,
18       and somehow or another we were so involved
19       with it that it shows -- my experience
20       actually came out and where I actually
21       handled that situation while he was there.
22   Q:  But how often did you and he have any --
23       have contact after -- I guess between
24       October 6th and December of 1998?
```

```
 1   A:   Right.

 2   Q:   So are you telling me it's just a coincidence

 3        that the last day you were supposed to work

 4        at Lauren's Way happened to coincide with

 5        the first day you were going to -- you

 6        started working at Laurel Springs?

 7   A:   No, that -- that would be correct.

 8   Q:   What would be correct?

 9   A:   That my first day of employment was going to

10        start on the 21st.

11   Q:   When did you know that your first day of

12        employment at Laurel Springs was going to be

13        on December 21st?

14   A:   Yeah, I must have already known that then,

15        now that -- now that I think about it.

16   Q:   When did you find out that you were going to

17        be starting work at Laurel Springs on

18        December 21st?

19   A:   That -- that was probably during the

20        interview.  I had a interview with Susan

21        McNeillich.

22   Q:   And when did you have an interview with Susan

23        McNeillich?

24   A:   I don't know.  It was prior to this notice.
```

CAPITAL REPORTING, INC.

```
1    Q:   How much prior to the notice?

2    A:   I don't know.  Like I said, I was out

3         looking, you know.

4    Q:   Did you tell anybody at Lauren's Way that you

5         were looking for other employment?

6    A:   No, I didn't.

7    Q:   Well, when did you start looking for other

8         employment?  Was it the beginning of

9         December, the middle of November, the

10        beginning of November?

11   A:   I may have already always been looking for

12        other employment.

13   Q:   You were always looking for other employment

14        when you were working at Lauren's Way?

15   A:   To better myself, so I can't say that this

16        particular time here is the only time I was

17        looking for employment.  I guess that's what

18        I'm saying.

19   Q:   Did you consider getting a job at Laurel

20        Springs an improvement from your position at

21        Lauren's Way?

22   A:   Like I said, I was probably already looking,

23        you know.

24   Q:   Did you consider that to be an improvement
```

```
 1          over your position at Lauren's Way?
 2   A:     As far as pay --
 3   Q:     You were being paid more at Laurel Springs
 4          than you were when you left Lauren's Way, is
 5          that correct?
 6   A:     Yes.
 7   Q:     Why did you give Lauren's Way two weeks'
 8          notice of your resignation?
 9   A:     Based on the -- I think I told you that
10          there was some problems, and that was
11          probably one of the reasons why I decided to
12          go ahead and look for other --
13   Q:     And look.  But my question is, why did you
14          give two weeks' notice?  Why didn't you just
15          walk into the office on December the 7th or
16          whatever and say goodbye?  Why did you give
17          two weeks' notice?
18   A:     First of all, to give a two weeks' notice is
19          the right thing to do, especially when you
20          want to be hired back into a company.
21          That's what most people do, they give two
22          weeks' notices.
23   Q:     Do you consider that two weeks to be the
24          proper thing to do for the company you're
```

1        leaving?

2   A:   Right.

3   Q:   But you didn't stay for two weeks, did you,

4        Mr. Johnson?

5   A:   No, I didn't.

6   Q:   You left at the beginning of the second

7        week, isn't that right, somewhere around

8        December the 15th?

9   A:   I left that week, yes.

10  Q:   And why did you fail to stay for the two

11       weeks?

12  A:   Because Larry Berry counseled me on -- on a

13       rehire situation.

14  Q:   You're saying because Mr. Berry told you you

15       were not supposed -- you should not have

16       hired Joe Swan you left the company that day?

17  A:   That's correct.  He was -- he was an

18       African-American and I didn't -- I didn't

19       think it was right for him to question me on

20       that when he already knew that I checked his

21       references and everything checked out.

22  Q:   What did that have to do with your

23       completing your two weeks' notice?

24  A:   Well, I thought I was harassed by him

```
 1   Q:   Just so -- I'm a little confused.  At

 2        Lauren's Way, did you have a free apartment

 3        or 50 percent off?

 4   A:   It was a free apartment at Lauren's Way.

 5   Q:   Lauren's Way was a free apartment?

 6   A:   Right.  So there was some differences there.

 7   Q:   But, I mean, I'm just -- but I'm just trying

 8        to -- I'm just wondering what else you told

 9        the manager at Laurel Springs as to why you

10        were looking for another position, other than

11        you were looking for a higher salary, if

12        anything?

13   A:   I may have also told her that I wanted to

14        see what it was like to work for another

15        company.  I may have said something like

16        that.

17   Q:   Anything else you can remember?

18   A:   Nothing else specifically right now.

19   Q:   Okay.  So tell me about your next -- what

20        was your next conversation with a

21        representative of Drucker & Falk after you

22        left Lauren's Way?

23   A:   I think I followed up with Kellie Falk-Tillet.

24   Q:   You followed up what with Kellie Falk-Tillet?
```

```
1   A:   An interest of coming back to the company.

2   Q:   You contacted Kellie Falk-Tillet?

3   A:   Yes.

4   Q:   When -- when did you contact Kellie

5        Falk-Tillet?

6   A:   It was around February or so of 1999.

7   Q:   So two months after you had left Lauren's

8        Way you contacted Kellie?

9   A:   Right.

10  Q:   And what did you tell Kellie Falk-Tillet?

11  A:   Well, I was expressing an interest of coming

12       back to the company; and she basically told

13       me who I needed to contact to do that

14       because she wasn't the one to do that.  So

15       she said to -- Steve Hayworth would be the

16       person to contact.

17  Q:   Did you talk to Kellie on the phone or in

18       person?

19  A:   We met for lunch at -- at Crowley's at

20       Stonehenge Market.

21  Q:   And you told Kellie you were interested in

22       coming back to work for the company.  Is

23       that all you told her?  I mean, did you get

24       into any specifics?
```

1   A:  I talked to her about coming back as a

2       maintenance supervisor.  She didn't know

3       whether or not they had --

4   Q:  She didn't know what?  I'm sorry.

5   A:  I talked to her about coming back to the

6       company as a maintenance supervisor.  She

7       didn't know if they actually had that.  And

8       like I said, she just asked me to get with

9       Steve Hayworth on that.

10  Q:  Why did she tell you to get with Steve

11      Hayworth?

12  A:  He would be the person to contact coming

13      back into the company to where I was coming

14      back into it.  He would -- he would have

15      knowledge and information of any jobs that

16      was available.

17  Q:  Of any superintendent jobs, you mean?

18  A:  Basically, whether it was maintenance related.

19  Q:  Just maintenance related in general?

20  A:  Right.

21  Q:  So what did you do after your lunch with

22      Kellie Falk-Tillet?

23  A:  Went back to -- went back to work at

24      Lauren's Way -- I'm sorry, Laurel Springs.

1  Q:  Did you -- why did you want to come back to
2      work at Drucker & Falk?
3  A:  I thought by coming back that way I may work
4      somewhere differently, at another community
5      other than where Larry Berry was working at.
6  Q:  What was wrong with your job at Laurel
7      Springs?
8  A:  Well, me and the manager didn't really see
9      eye to eye on things and -- to include what
10     I'm responsible for as a maintenance
11     supervisor.
12 Q:  What kind of things did you disagree about?
13 A:  She basically wanted to micromanage the whole
14     situation.  There was times when things
15     wasn't getting done because I didn't know
16     about it.  Like an apartment, for instance,
17     was moving in before it -- it actually got
18     turned over, meaning prepared for a next
19     move-in.
20 Q:  I'm not sure I understand.
21 A:  Well, what I'm saying is she wanted to
22     micromanage the whole property and not
23     necessarily let me do what I needed to do to
24     get the job done at the apartment community

```
1              he told me he didn't have anything available
2              right then but he would keep me in mind for
3              the future.
4        Q:    Did y'all talk about what you wanted to do
5              at the company, you and Steve Hayworth?
6        A:    I don't think it was a drawn-out
7              conversation other than the fact that I was
8              telling him I wanted to come back to work in
9              maintenance.  I mean, I wouldn't say, "Hey,
10             Steve, I want to come back and work as a
11             maintenance supervisor."
12                  He understood that I was a maintenance
13             supervisor already.  So, naturally, he knew I
14             was talking about coming back to the company
15             to work as a maintenance supervisor.
16       Q:    Well, at the time that you talked -- that
17             you called Kellie Falk-Tillet, were you aware
18             of any open superintendent positions?
19       A:    Oh, no, I wasn't aware of anything.  I just
20             -- all I knew is I just wanted to talk to
21             her about coming back to the company.
22       Q:    And what about when you talked to Steve
23             Hayworth the first time, were you aware of
24             any open positions for superintendent?
```

```
 1   A:   No, sir.

 2   Q:   And Kellie didn't tell you that -- she told

 3        you that there were no positions -- no.

 4        What did Kellie tell you?

 5   A:   No.  She just asked me to get with Steve

 6        Hayworth, that he would be the person to

 7        contact.

 8   Q:   And then Steve told you that he wasn't aware

 9        of any open superintendent positions at the

10        time?

11            MR. HUTSON:   Objection as to form.

12   A:   Right.

13   Q:   What did -- what did Steve Hayworth tell you?

14   A:   He simply told me that he didn't have

15        anything available right then, that he would

16        keep me in mind in the future.

17   Q:   Was that the end of your initial

18        conversation with Steve Hayworth?

19   A:   I mean, I knew Steve.  We talked.  I mean,

20        we might have had other conversations that

21        weren't related to that.  Just how are you

22        doing or something like that.

23   Q:   Uh-huh (yes).  So you didn't fill out any

24        application or anything at that time, did you?
```

```
 1   A:   No.
 2                    MR. HUTSON:   Objection as to
 3             form.   You can answer.
 4   A:   They already had a application on me.
 5   Q:   You mean for the -- when you had filled out
 6        one for Stonehenge, you mean?
 7   A:   Because I didn't -- I don't even remember if
 8        I filled out one for Lauren's Way.
 9   Q:   Okay.
10   A:   I figured the initial employment application
11        was what they had.
12   Q:   All right.   Well, tell -- I mean, what
13        happened after -- what happened after your
14        first conversation with Steve Hayworth?   Did
15        you -- did you have another conversation
16        with Mr. Hayworth?
17   A:   Yes.   I followed up with him on several
18        occasions.
19   Q:   When were the dates of these additional
20        conversations with Mr. Hayworth?
21   A:   They were continuous from February all the
22        way into June -- February of 1999 to June of
23        1999.
24   Q:   Well, how many conversations did you have
```

1   Q:  And -- and so my question is, did that --

2       the incident with the apartment occur prior

3       to February of 1999 or -- did it occur prior

4       to February of 1999?

5   A:  Well, what I said was there was a lot of

6       things that happened, and I may have

7       included that prior to.  That might have

8       been a mistake or whatever, but --

9   Q:  If so, that's fine.  I just -- that's why I

10      just want to get --

11  A:  Yeah.

12  Q:  -- the correct testimony.

13  A:  Right.  I mean, there was a lot of things

14      happening.  I may have just compiled

15      everything right then and there, you know.

16      That -- I could have made a mistake by

17      saying that happened right then and there.

18          In actuality, there was a lot of things

19      that happened from that point all the way up

20      until my last day, and I might have just

21      compiled it with everything else.

22  Q:  What were you going to do about a job when

23      you quit on June the 1st?

24  A:  Well, I shot myself in the foot on that one.

```
 1          I mean, when I quit, I knew I didn't have a
 2       job to go to.  That's how bad it was.  I've
 3       never put myself in a situation like that
 4       before.
 5    Q:  So you quit Laurel Springs on June 1st
 6       knowing you didn't have another job
 7       opportunity?
 8    A:  Yes.
 9    Q:  Okay.  So then a couple of months went by,
10       and then you started working at The Palms
11       Apartments in August of 1999, is that correct?
12    A:  That's correct.
13    Q:  When you received the letter from Steve
14       Hayworth, which is Exhibit No. -- what is
15       that -- 10 --
16    A:  No. 10.
17    Q:  -- what did you do after you received that
18       letter?
19    A:  Well, I was -- I was devastated.  When I got
20       the letter from my mom's mailbox -- me and
21       my wife got it.  We was out riding.  We read
22       it together and we was, like, wow, you know.
23       I don't have a job.  I get a letter like
24       this back, and I was just devastated by it.
```

```
 1      not?
 2   A: No, I don't.
 3   Q: And when did you -- and when did you find
 4      out the reasons that -- or the supposed
 5      reasons that Ralph Ray had quit Hunting Ridge?
 6   A: I found out sometime during that summer.
 7      Like I said, I had conversation with
 8      somebody. People -- people talk within the
 9      company. I talked to so many different
10      people. I can't possibly remember everybody,
11      every conversation I talked to somebody about
12      somebody else.
13   Q: And so then when you were working at -- a
14      year later, when you were working at
15      Edinborough Commons, you're saying a supplier
16      came in on the property and y'all started
17      talking about Ralph Ray?
18   A: Yes. I mean, he volunteered the information
19      to me. I didn't ask.
20   Q: Who was the supplier?
21   A: I can't even remember right now. It could
22      have been -- I want to say it was Mack from
23      -- I think it was actually Ross Aull, Alt,
24      something. I can't remember his last name.
```

| | | |
|---|---|---|
| 1 | | something about Chris Seagrove leaving the |
| 2 | | company? |
| 3 | A: | He left the company when he worked for The |
| 4 | | Groves Apartments.  He told me that he |
| 5 | | couldn't handle that apartment community and |
| 6 | | he -- he quit. |
| 7 | Q: | When was -- when was Seagrove working for |
| 8 | | The Groves? |
| 9 | A: | He worked all the way up until around May or |
| 10 | | so of 1996. |
| 11 | Q: | What was he doing at The Groves? |
| 12 | A: | He was a maintenance supervisor. |
| 13 | Q: | So he was a maintenance supervisor at The |
| 14 | | Groves until 1996? |
| 15 | A: | Right. |
| 16 | Q: | And then you're saying that Seagrove told |
| 17 | | you that he walked off -- that he walked off |
| 18 | | that job -- |
| 19 | A: | Yes, that's correct. |
| 20 | Q: | -- as maintenance supervisor? |
| 21 | A: | Yes. |
| 22 | Q: | And why did he tell you he did that? |
| 23 | A: | It was he couldn't deal with the pressure of |
| 24 | | that property. |

1   A:   I had no way of knowing that until I worked

2         with him.

3   Q:   Well, you worked with him.  Wasn't he a good

4         technician?

5   A:   Yes.  I'm talking I didn't know that prior

6         to him coming to the company, what kind of

7         worker he was.

8   Q:   Well, did Seagrove ever specifically tell you

9         he walked off the job at The Groves without

10        giving any notice?

11   A:   That's what he told me.

12   Q:   He told you he walked off without giving any

13        notice?

14   A:   Yes.

15   Q:   Why were you having that discussion?

16   A:   He told me.  In conversation we began to get

17        to know each other well enough that -- where

18        I guess he felt like he could volunteer that

19        kind of information to me.  And he did, in

20        fact, tell me that.

21   Q:   He -- he left?

22   A:   He told me he walked off the job because he

23        couldn't stand the pressure any more at that

24        property.  He just couldn't handle it.

```
 1          Cook's resignation?
 2     A:   Yes, just the people within the office,
 3          Janie Yonnell and --
 4     Q:   Yonnell?
 5     A:   Yonnell.  She was the assistant manager at
 6          the time.
 7     Q:   The assistant manager at Lauren's Way?
 8     A:   At Lauren's Way.
 9     Q:   And what did you and her discuss about Ms.
10          Cook's leaving Lauren's Way?
11     A:   I mean, it was just some minimal talk that
12          she was out the door, she got a resignation.
13          It was kind of hush-hush.  You know, just
14          general conversation.  Just that she --
15     Q:   So you have no idea why she resigned, do you?
16     A:   No, I don't.
17     Q:   Okay.  And then you claim at some point in
18          -- you have no idea whether she gave any
19          notice of resignation either, do you?
20     A:   No.
21     Q:   So she may have given two weeks' notice of
22          resignation?
23     A:   It's possible, yes.
24     Q:   And it's your understanding that Ms. Cook
```

1   A:   The Apartments at Stonehenge.

2   Q:   And when did he leave at Stonehenge?

3   A:   Around September of 1997.

4   Q:   Was it 1997 or 1998?

5   A:   I think it was 1997.

6   Q:   Where were you at the time?

7   A:   I was at Lauren's Way.

8   Q:   Had you just gotten to Lauren's Way?

9   A:   I had been there for -- since July the 15th.

10   Q:   So Hudda had worked with you at Stonehenge,

11       is that right?

12   A:   We never really -- well, we worked together

13       briefly because I was promoted over to

14       Lauren's Way.

15   Q:   Shortly after Hudda came to work for

16       Stonehenge?

17   A:   Right.

18   Q:   Well, why did Hudda leave Stonehenge?

19   A:   I don't know.  Mike -- Howard Waddill just

20       told me that he was leaving.

21   Q:   Who told you?

22   A:   Howard Waddill.

23   Q:   Just told you that Mike Hudda was leaving?

24   A:   Yeah.

```
 1   Q:   Did he tell you that he was resigning or
 2        that he was fired?
 3   A:   No, he didn't say either way.
 4   Q:   He didn't say?  He just said he was leaving?
 5   A:   Yes.
 6   Q:   Do you know why he left?
 7   A:   No.
 8   Q:   Do you know if he gave any notice?
 9   A:   No.
10   Q:   And you think that he was rehired by Drucker
11        & Falk at some point?
12   A:   Yes, he was.
13   Q:   And when was that?
14   A:   It was around October, November of 1998.
15   Q:   So about a year later he was rehired at
16        Drucker & Falk.  Where was he rehired?
17   A:   For an apartment community, new construction
18        property that was going up in the Wake
19        Forest area.
20   Q:   What was he hired to do?
21   A:   He was the maintenance supervisor.
22   Q:   Supervisor?  What had he been doing before he
23        was rehired?
24   A:   I don't have a clue.  I -- I know that
```

Q: And somebody informed you that Tony Bains had previously worked for Drucker & Falk and was now being rehired or --

A: I knew that -- I knew that by the -- the safety meeting and speaking to Joe Swan.

Q: You knew what, that --

A: That he had worked for the company I think previously and he was hired back and he was working at Stonehenge Apartments.

Q: So Tony Bains was hired at Stonehenge Apartments at the time you were working at Lauren's Way?

A: Yes.

Q: What was he hired to do at Stonehenge?

A: I think it was assistant maintenance person, but he didn't live on site. He had his own place.

Q: And when -- and so who told you that Mr. Bains had previously worked in a Drucker & Falk managed apartment community?

A: I found that out at the safety meeting when the -- one of the management people congratulated him back.

Q: Do you know any of the circumstances

1     surrounding his leaving Drucker & Falk the

2     first time?

3  A:  No.

4  Q:  You don't know if he gave -- do you know if

5     he gave any notice of termination?

6  A:  No.

7  Q:  Do you know any of the circumstances

8     regarding him being rehired?

9  A:  No.

10 Q:  Other than Chris Seagrove, Denise Cook, Mike

11    Hudda, Tony Bains and Ralph Ray, are you

12    aware of any other people that were rehired

13    at Drucker & Falk after they had left the

14    company?

15 A:  No.

16    [RECESS TAKEN - 3:38 P.M. TO 3:49 P.M.]

17 Q:  Okay, we're back on the record.  Mr.

18    Johnson, is there anyone you know of that can

19    back up your claims of discrimination by

20    Drucker & Falk?

21 A:  The claim of discrimination itself?

22 Q:  Yes, your claim --

23 A:  There's no one that can --

24 Q:  -- of racial discrimination against Drucker &

| | | |
|---|---|---|
| 1 | Q: | So there's no one person you can think of |
| 2 | | that you believe actually discriminated |
| 3 | | against you -- rephrase that. |
| 4 | | Is there any particular person at |
| 5 | | Drucker & Falk that you believe really |
| 6 | | discriminated against you because you were |
| 7 | | black in 1999? |
| 8 | A: | No. |
| 9 | Q: | Okay. Let's move on. You also allege in |
| 10 | | your Complaint that you suffered some type |
| 11 | | of emotional distress, is that correct? |
| 12 | A: | Yes. |
| 13 | Q: | Explain what type of emotional distress you |
| 14 | | contend you suffered. |
| 15 | A: | I just -- just the rejection of the letter |
| 16 | | itself. I mean, I thought I did a good job |
| 17 | | at the company. |
| 18 | Q: | You felt disappointed? |
| 19 | A: | I felt discriminated against. |
| 20 | Q: | I'm asking, did you feel disappointed when you |
| 21 | | received the letter? |
| 22 | A: | Yes, I felt disappointed. I was upset. |
| 23 | Q: | But you didn't have any physical symptoms of |
| 24 | | any distress, did you? |

```
 1   A:   No.

 2   Q:   Did you have any mental symptoms of distress?

 3   A:   Yes.

 4   Q:   What?

 5   A:   Just my mental state was just -- I didn't

 6        have a job.  I just got rejected by a

 7        company I used to work for and --

 8   Q:   But you did have a job -- oh, no.  You had

 9        quit the job.  You'd quit Laurel Springs.

10        You never went to see a doctor about any

11        distress, did you?

12   A:   No.

13   Q:   Were you ever diagnosed by any doctor for

14        any type of emotional distress?

15   A:   No.

16   Q:   Did you ever suffer any symptoms at all of

17        distress?

18   A:   No.

19   Q:   What actions do you feel Drucker & Falk took

20        to cause you emotional distress?

21   A:   The fact that I wasn't rehired back into the

22        company, the rejection letter, the knowledge

23        of white people being hired back into the

24        company and I wasn't allowed to come back
```

1        into the company, knowing that I did a good

2        job for the company was enough for me.

3  Q:  You think somebody at Drucker & Falk actually

4        meant for you to suffer distress?

5  A:  Do I think they meant it?

6  Q:  Yes.  Do you think somebody at Drucker &

7        Falk actually intended that you suffer some

8        deep, severe emotional distress?

9  A:  No.

10  Q:  Let me talk a little bit about the damages.

11       You claim in your Complaint that you've

12       suffered damages exceeding $15,000.  Where

13       did that number come from?

14  A:  Mr. Shedor, which is my attorney.

15  Q:  Yes.  That's the number he came up with for

16       you?

17  A:  Yes, sir.  We -- we both talked about it, of

18       course.

19  Q:  Well, how -- what did y'all -- how did you

20       come up with that number?  What -- explain

21       to me the damages you contend you suffered

22       -- you contend that you suffered because of

23       actions of Drucker & Falk.

24  A:  I mean, just by consulting with my attorney.